UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF TEXAS

DALLAS DIVISION

| | |
|---|---|
| TERRI E. NEWKIRK IRA, derivatively on behalf of SOUTHWEST AIRLINES CO., <br><br>          Plaintiff, <br><br>    vs. <br><br> GARY C. KELLY, DAVID W. BIEGLER, J. VERONICA BIGGINS, DOUGLAS H. BROOKS, WILLIAM H. CUNNINGHAM, JOHN G. DENISON, THOMAS W. GILLIGAN, DAVID P. HESS, ROBERT E. JORDAN, NANCY B. LOEFFLER, JOHN T. MONTFORD, CHRIS P. REYNOLDS, RON RICKS, ANDREW WATTERSON, RYAN GREEN, TAMMY ROMO, LINDA RUTHERFORD and MARK R. SHAW, <br><br>    and <br><br> SOUTHWEST AIRLINES CO., <br><br>          Nominal Defendant. | Case No. 3:23-cv-1339 <br><br> VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT <br><br> JURY TRIAL DEMANDED |

## TABLE OF CONTENTS

I.     SUMMARY OF THE ACTION ............................................................................. 1

II.    JURISDICTION AND VENUE ............................................................................. 5

III.   PARTIES ............................................................................................................. 6

    A.    PLAINTIFF ................................................................................................. 6

    B.    NOMINAL DEFENDANT ........................................................................... 6

    C.    THE DIRECTOR AND OFFICER DEFENDANTS ....................................... 6

    D.    DIRECTORS JILL SOLTAU, EDURADO F. CONRADO AND ELAINE MENDOZA ........ 9

IV.    THE INDIVIDUAL DEFENDANTS' FIDUCIARY DUTIES TO SWA AND ITS STOCKHOLDERS ............................................................................................ 10

    A.    TEXAS LAW ............................................................................................ 10

    B.    FEDERAL SECURITIES LAW ................................................................. 111

    C.    SOUTHWEST'S CORPORATE GOVERNANCE ...................................... 12

        1.    The Company's Corporate Governance Guidelines ........................... 12

        2.    The Company's Audit Committee Duties ........................................... 133

        3.    Duties of the Company's Operations Review Committee ................. 144

V.     SUBSTANTIVE ALLEGATIONS .................................................................. 144

    A.    THE COMPANY ....................................................................................... 144

    B.    SWA'S OUTDATED MISSION CRITICAL SCHEDULING INFRASTRUCTURE ........ 166

    C.    THE CATASTROPHIC MELTDOWN OF SWA'S SCHEDULING INFRASTRUCTURE  188

        1.    Wednesday, December 21, 2022 ...................................................... 188

        2.    Thursday, December 22, 2022 ........................................................... 18

        3.    Friday, December 23, 2022 ................................................................ 19

        4.    Saturday, December 24, 2022 ........................................................... 211

        5.    Sunday, December 25, 2022 .............................................................. 233

6.   Monday, December 26, 2022 ................................................. 244

7.   Tuesday, December 27, 2022 ................................................ 300

8.   Wednesday, December 28, 2022 ........................................... 388

9.   Thursday, December 29, 2022 ...............................................411

10.  Friday, December 30, 2022 .................................................. 444

11.  Tuesday, January 3, 2023.................................................... 444

12.  SWAPA Announces Intent to Call for Historic Strike Vote
     Authorization ...................................................................... 455

D.   SWA'S FOURTH QUARTER 2022 FINANCIAL RESULTS ...................................... 466

E.   SWA ANNOUNCES AN "ACTION PLAN" .................................................... 477

F.   APRIL 18, 2023 NATIONWIDE GROUNDING OF SWA FLEET ............................. 477

G.   FIRST QUARTER 2023 RESULTS ........................................................ 488

H.   THE MELTDOWN WAS AVOIDABLE ........................................................ 49

     1.   Defendants Ignored Repeated Warnings that SWA's Crew Scheduling
          Infrastructure was Inadequate for the Company's Size and
          Complexity ........................................................................ 49

     2.   Defendants Ignored Prior Operational Meltdowns ...........................511

     3.   Senior Officials Admitted SWA's Technology Failed to Keep Pace with
          the Company's Grow and Complexity ........................................511

     4.   Analysts Reported that SWA Lagged Technologically ......................511

VI.   DERIVATIVE ALLEGATIONS .............................................................511

A.   GENERAL DERIVATIVE ALLEGATIONS .................................................... 522

B.   PRE-SUIT DEMAND .................................................................... 522

C.   THE SOUTHWEST BOARD'S REJECTION OF THE DEMAND .............................. 522

VII.  SOUTHWEST'S 2022 PROXY STATEMENT ............................................... 533

VIII. DAMAGES SUFFERED BY SOUTHWEST ................................................... 555

A.   FINANCIAL RESULTS .................................................................. 566

      **B.**     **REFUNDS FOR CANCELLED FLIGHTS** ..................................................... 57

      **C.**     **LOST TICKET SALES** ........................................................................... 57

      **D.**     **LOST BAGGAGE CLAIMS** ..................................................................... 58

      **E.**     **REIMBURSEMENTS FOR HOTELS, MEALS AND ALTERNATE TRAVEL** .................. 58

      **F.**     **DAMAGE TO BRAND AND REPUTATION** .................................................. 58

      **G.**     **DECLINE IN STOCK PRICE** ................................................................... 59

      **H.**     **INCREASED DOT SCRUTINY** ................................................................ 59

      **I.**     **CONGRESSIONAL INVESTIGATIONS** ....................................................... 59

      **J.**     **CLASS ACTION LAWSUITS** ................................................................. 600

      **K.**     **DAMAGE TO LABOR RELATIONS** ..........................................................611

      **L.**     **INCREASED REGULATION AND SCRUTINY** ..............................................611

**IX.**     **CAUSES OF ACTION** ................................................................................ 622

      **COUNT I - Against Director Defendants Biegler, Biggins, Brooks, Cunningham, Denison, Gilligan, Hess, Jordan, Kelly, Loeffler, Reynolds, Montford and Ricks for Violations of § 14(a) of the Exchange Act** ……………………….………………62

      **COUNT II - Against the Individual Defendants for Breach of Fiduciary Duties** .....65

      **COUNT III - Against the Individual Defendants for Indemnification** ……………67

      **COUNT IV - Against the Individual Defendants for Unjust Enrichment** …………68

**PRAYER FOR RELIEF** …………………………………………………….………68

**X.**     **JURY DEMAND** ........................................................................................ 69

The Terri E. Newkirk IRA (the "IRA" or the "Plaintiff"), by its undersigned attorneys, brings this verified stockholder derivative action on behalf of nominal defendant Southwest Airlines Co., ("Southwest", "SWA" or the "Company") against certain members of the SWA Board of Directors ("Board") and executive management for breaches of fiduciary duties and other improper conduct that materially damaged the Company and its stockholders. These allegations are made upon personal knowledge as to the Plaintiff and upon information and belief as to all other matters. Plaintiff's information and belief is based upon its counsels' investigation and review of, among other things, U.S. Securities and Exchange Commission ("SEC") filings, press releases, news reports, analyst reports, Southwest.com, and other publicly available information pertaining to SWA. Plaintiff believes substantial additional support for these allegations exists and will be identified and developed after reasonable opportunity for discovery.[1]

I.      SUMMARY OF THE ACTION

1.      This stockholder derivative action seeks money damages and remedial relief caused by Defendants' breaches of fiduciary duties in their years-long failure to update the Company's mission critical IT infrastructure relied upon by SWA to schedule aircraft and fight crews despite repeated dire warnings that at any unexpected scheduling glitch, SWA would not be able to timely and appropriately track and reassign flight crews and airplanes subjecting the Company to snowballing flight cancellations and delays.  Defendants, and each of them, knew SWA's outdated and inadequate IT infrastructure needlessly exposed the Company to massive financial losses and reputational harm.

---

[1] Plaintiff reserves the right to amend its Complaint as additional information is disseminated.

1

2.      At all relevant times, SWA relied upon a patchwork of decades old software packages to schedule airplanes and flight crews.  SWA's Crew Scheduling department relied upon a software tool called "SkySolver" a/k/a "Crew Optimization" for staffing each SWA flight with pilots and flight attendants.  SWA's Flight Dispatch department proposed solutions for flight cancelations and delays with a separate software tool called "Baker."  Changes to flight schedules and reassignments of pilots and flight attendants were by telephone with schedulers at the Company's Network Operation Center.

3.      SWA's crew scheduling infrastructure operated well during fair weather but struggled to recover from schedule disruptions regardless of cause.  SWA's failing crew scheduling infrastructure was known to contribute to increasingly frequent operational meltdowns.

4.      Both the SWA pilots' union, Southwest Airlines Pilots Association ("SWAPA") and flight attendants' union, Transport Workers Union of America Local 556 ("TWU 556") warned for years that the Company's crew scheduling technology was failing.  For years, both SWAPA and TWU 556 pleaded with the Company to update its crew scheduling technology, but the Company refused.  According to SWA union leaders, small changes and investments did not result in improvements.

5.      On November 12, 2022, SWAPA president, Captain Casey Murray ("Capt. Murray") stated with regard to SWA's dangerously precarious crew scheduling technology:

> I fear that we (SWA) are one thunderstorm, one ATC (air traffic control) event, one router brownout from a complete meltdown. Whether that's Thanksgiving, or Christmas, or New Year, that's the precarious situation we are in.

2

6.      Members of SWA senior management and the Board each knew the Company's crew scheduling infrastructure had not been kept up to date.  On December 6, 2022, the *Dallas Business Journal* reported that, as an example, if a SWA pilot or flight attendant gets reassigned to another flight or a different hotel, someone has to call them on the telephone or chase them down physically in the airport and let them know.  SWA CEO Bob Jordan admitted:

> We're behind.  As we [SWA] have grown, we have outscaled and outgrown our tools . . .  At our size and scale, that's just not OK.  It's not only inefficient, it's hard on our employees.  There's a lot of work to do to catch the tools up to the complexity of the airline.

*   *   *

> I do think the scale and the growth of the airline [SWA] got ahead of the tools that we have.

7.      SWA's crew scheduling house of cards fell less than three weeks later.  Winter Storm Elliot overwhelmed Southwest's decrepit crew scheduling infrastructure.  While competitor airlines quickly recovered from Winter Storm Elliot, SWA plunged into a catastrophic Company-wide operational collapse.  SWA cancelled about 16,700 flights from December 22-29, 2022, and stranded an estimated 2 million passengers.

8.      SWA's meltdown, according to the U.S. Department of Transportation ("DOT"), was "a shocking and unacceptable level of disruption," and "beyond what can be attributed to the weather."  TWU 556 president, Lyn Montgomery ("Montgomery") attributed the SWA December 2022 collapse to a complete failure of SWA leadership in their decision to expand SWA operations without the needed scheduling technology.

3

9.      The Company estimated the cost of the meltdown to SWA at up to $825 million. Ultimately, the costs to the Company will be much higher.  In addition, SWA suffered the most extensive damage to the Southwest brand in the Company's 51-year history.  Still further, SWA has been subjected to consumer class action lawsuits, federal securities class action lawsuits, and investigations by the DOT and U.S. Congress.

10.     Defendants' breaches of fiduciary duties directly and proximately caused damage to SWA.  Defendants ignored repeated warnings that SWA's inadequate and outdated scheduling infrastructure posed unacceptable financial, operational, and reputational risks upon the Company in order to inflate current period remuneration and profits.

11.     SWA's December 2022 operational meltdown was both predictable and preventable.  It occurred and is attributable to Defendants putting their own financial self-interests above the interest of the Company.  Defendants' breaches of fiduciary duties have imposed massive financial losses on the Company likely to exceed $1 billion.

12.     On January 24, 2023, Plaintiff made its pre-suit demand upon the SWA Board to investigate, remediate and prosecute claims alleged herein.

13.     As of the filing of this Complaint, SWA has neither commenced action against any of the Defendants, nor has the Company announced formation of a Special Litigation Committee to investigate the Defendants' alleged wrongful conduct.  As such, the Plaintiff considers its pre-suit demand refused by the SWA Board.

## II.   JURISDICTION AND VENUE

14.   This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act, (15 U.S.C. § 78n(a)(1)) and Rule 14a-9 of the Exchange Act (17 C.F.R. § 240.14a-9). Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, U.S. Mail, and the facilities of a national securities exchange in connection with the acts, conduct and other wrongs complained of herein.

15.   Additionally, diversity jurisdiction is conferred by 28 U.S.C. § 1332. Plaintiff and Defendants are citizens of different states and the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

16.   This Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367(a).

17.   This is not a collusive action designed to confer jurisdiction on a United States district court that it would not otherwise have.

18.   This Court has personal jurisdiction over each of the Defendants because each defendant is either a corporation which conducts business in this District or is an individual who has sufficient minimum contacts with this District.

19.   Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b) and 1401 because one or more defendants either resides in or maintains executive offices in this District, Southwest is incorporated in this District, and a substantial portion of the transactions and wrongs complained of, including Defendants' wrongful acts complained of herein, occurred in this District.

### III.   PARTIES

#### A.   PLAINTIFF

20.     Plaintiff is a current shareholder of Southwest common stock and has continuously held Southwest common stock at all relevant times.  Plaintiff is a citizen of North Carolina.

#### B.   NOMINAL DEFENDANT

21.     Nominal defendant Southwest is a corporation incorporated under the laws of the State of Texas and maintains its principal executive offices in Dallas, Texas.  According to its public filings with the SEC, Southwest touts itself as a major passenger airline that provides scheduled air transportation in the United States and near-international markets.

#### C.   THE DIRECTOR AND OFFICER DEFENDANTS

22.     Defendant Gary C. Kelly ("Kelly") has served as a director since 2004.  Kelly serves as the Chair of the Company's Executive Committee.  Since May 2008, Kelly has also served as Chairman of the Board.   Kelly served as the Company's CEO for over 17 years - from July 2004 to February 2022 and has served in various senior roles with the Company for the past thirty (30) years.  According to the Company's 2023 Proxy Statement, Kelly was compensated over $20 million from 2020 to 2022.  Upon information and belief, Kelly is a citizen of Texas.

23.     Defendant Robert E. Jordan ("Jordan") has served as a director since 2022, the Company's CEO since February 2022 and its President since January 2023.  Jordan has served in various senior roles with the Company for the past thirty (30) years.  Jordan is a member of the Executive Committee.  Upon information and belief, Jordan is a citizen of Texas.

24.     Defendant David W. Biegler ("Biegler") has served as a director since 2006. Biegler serves as the Chair of the Compensation Committee and is a member of the Safety and Compliance Oversight Committee and Executive Committee.  Upon information and belief, Biegler is a citizen of Texas.

6

25.     Defendant J. Veronica Biggins ("Biggins") has served as a director since 2011. Biggins serves as the Chair of the Nominating and Corporate Governance Committee and is a member of the Compensation Committee.  Upon information and belief, Biggins is a citizen of Georgia.

26.     Defendant Douglas H. Brooks ("Brooks") has served as a director since 2010. Brooks is a member of the Compensation Committee, Nominating and Corporate Governance Committee and the Operations Review Committee.[2]  Upon information and belief, Brooks is a citizen of Texas.

27.     Defendant William H. Cunningham ("Cunningham") has served as a director since 2000.   Cunningham is a member of the Audit Committee, Executive Committee and the Nominating and Corporate Governance Committee.  Upon information and belief, Cunningham is a citizen of Texas.

28.     Defendant John G. Denison ("Denison") has served as director since 2008 and did not stand for re-election to the Company's Board at the annual shareholder meeting on May 17, 2023, but was a board member at the time the Demand was made.  Denison served as the Chair of the Safety and Compliance Oversight Committee and as a member of the Audit Committee and the Executive Committee.  Upon information and belief, Denison is a citizen of Texas.

29.     Defendant Thomas W. Gilligan ("Gilligan") has served as a director since 2015. Gilligan is a member of the Audit Committee and the Nominating and Corporate Governance Committee.  Upon information and belief, Gilligan is a citizen of Texas.

---

[2] The Operations Review Committee was formed on or about January 17, 2023, in the wake of the Company's December 2022 operational meltdown.

30. Defendant David P. Hess ("Hess") has served as a director since 2021. Hess is a member of the Audit Committee, Operations Review Committee, and Chair of the Safety and Compliance Oversight Committee. Upon information and belief, Hess is a citizen of Connecticut.

31. Defendant Nancy B. Loeffler ("Loeffler") has served as a director since 2003 and did not stand for re-election to the Company's Board at the shareholder annual meeting on May 17, 2023, but was a board member at the time the Demand was made. Loeffler was a member of the Compensation Committee and Nominating and Corporate Governance Committee. Upon information and belief, Loeffler is a citizen of Texas.

32. Defendant John T. Montford ("Montford") has served as a director since 2002. Montford serves as the Chair of the Audit Committee and is a member of the Nominating and Corporate Governance Committee. Upon information and belief, Montford is a citizen of Texas.

33. Defendant Chris P. Reynolds ("Reynolds") has served as a director since 2021. Reynolds is a member of the Compensation Committee and the Safety and Compliance Oversight Committee. Upon information and belief, Reynolds is a citizen of Texas.

34. Defendant Ron Ricks ("Ricks") has served as a director since 2015. Ricks serves as Chair of the Operations Review Committee. Ricks is also a member of the Compensation Committee, Executive Committee and the Safety and Compliance Oversight Committee. Upon information and belief, Ricks is a citizen of Texas.

35. Defendant Andrew Watterson ("Watterson") has served as SWA Chief Operating Officer since October 2022 and previously served as Executive Vice President & Chief Commercial Officer. Watterson joined SWA in 2013 as Vice President of Network Planning and Performance. Prior to SWA, Watterson was a partner with Oliver Wyman's aviation consulting practice.

36.     Defendant Ryan Green ("Green") serves as SWA Executive Vice President and Chief Commercial Officer and is a 20-year SWA employee.  Upon information and belief, Green is a citizen of Texas.

37.     Defendant Tammy Romo ("Romo") served as SWA Executive Vice President and Chief Financial Officer responsible for the airline's overall Finance activities, including Corporate Planning and Financial Planning and Analysis since 2012.  Romo has been an SWA employee since 1991.  Upon information and belief, Romo is a citizen of Texas.

38.     Defendant Linda Rutherford ("Rutherford") served as SWA Chief Administration and Communications Officer since October 2022.  Rutherford has been an SWA employee since 1992.  Upon information and belief, Rutherford is a citizen of Texas.

39.     Defendant Mark R. Shaw ("Shaw") served as Executive Vice President Chief Legal & Regulatory Office principally responsible for advising the Board of Directors and Senior Management since 2000.  Upon information and belief, Shaw is a citizen of Texas.

### D.     DIRECTORS JILL SOLTAU, EDUARDO F. CONRADO AND ELAINE MENDOZA

40.     Jill Soltau ("Soltau") became a SWA director effective February 15, 2023 *after* Plaintiff served its demand upon the Company's Board in January 2023.  Thus, Soltau is not named as a defendant in this Complaint.

41.     Eduardo F. Conrado ("Conrado") and Elaine Mendoza ("Mendoza") were elected to the Board at the Annual Meeting of Shareholders on May 17, 2023 *after* Plaintiff served its demand upon the Company's Board in January 2023.  Thus, Conrado and Mendoza are not named as defendants in the Complaint.

42.     Defendants Biegler, Biggins, Brooks, Cunningham, Denison, Gilligan, Hess, Jordan, Kelly, Loeffler, Montford, Reynolds, and Ricks shall be collectively referred to herein as "the Director Defendants." Defendants Watterson, Green, Romo, Rutherford, and Shaw shall be collectively referred to herein as "the Officer Defendants."  The Director Defendants together with the Officer Defendants shall be collectively referred to herein as the "Individual Defendants."

## IV.   THE INDIVIDUAL DEFENDANTS' FIDUCIARY DUTIES TO SWA AND ITS STOCKHOLDERS

### A.     TEXAS LAW

43.     Directors and officers of a Texas corporation owe fiduciary duties to the corporations they serve or served in the actions they take as directors.  By reason of their positions as officers, directors, and/or fiduciaries of Southwest and because of their ability to control the business and corporate affairs of Southwest, the Individual Defendants each owed Southwest core fiduciary duties, including but not limited to, duty of care, duty of loyalty, and duty of obedience. The Individual Defendants were and are required to use their upmost ability to control and manage Southwest in a fair, just, honest, and equitable manner.

44.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of Southwest, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company.  Because of their advisory, executive and managerial, and directorial positions with Southwest, each of the Individual Defendants had knowledge of material non-public information regarding the Company.

45.     The conduct of the Individual Defendants alleged herein violated their fiduciary duties as Southwest directors and officers and exhibits the absence of good faith and a conscious disregard for the best interests of the Company.   Furthermore, the Individual Defendants completely abdicated their responsibilities, and their conduct is not protected by the business judgment rule.

46.     To discharge their duties, the officers and directors of Southwest were required to exercise reasonable and prudent oversight and supervision over the management, policies, practices and controls of the Company.   By virtue of such duties, the officers and directors of Southwest were required to, among other things:

> a)     Exercise good faith to ensure that the affairs of the Company were conducted in an efficient, business-like manner so as to make it possible to provide the highest quality performance of their business;
>
> b)     Exercise good faith to ensure that the Company was operated in a diligent, honest and prudent manner and complied with all applicable federal and state laws, rules, regulations and requirements, and all contractual obligations; and
>
> c)     When put on notice of problems with the Company's business practices and operations, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence.

**B.     FEDERAL SECURITIES LAW**

47.     Pursuant to Section 14(a) of the Exchange Act, the Director Defendants have a duty to make truthful disclosures and representations in the Company's annual proxy statements. Specifically, Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, states that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. §240.14a-9.

48.     In accordance with federal law, Southwest's officers and directors are prohibited from making any material misrepresentation or omission in connection with the solicitation of proxy votes from Southwest's shareholders.

C.     **SOUTHWEST'S CORPORATE GOVERNANCE**

1.     **The Company's Corporate Governance Guidelines**

49.     According to Southwest's Corporate Governance Guidelines (the "Governance Guidelines"), the fundamental responsibility of members of the Company's Board of Directors is to promote the best interests of the Company and its shareholders by overseeing the management of the Company's business.

50.     The Governance Guidelines specifically state that Defendants, as members of the Board of Directors, are charged with the following responsibilities and obligations: (a) the duty of care, which requires that Board members exercise appropriate diligence in making decisions and in overseeing management; and (b) the duty of loyalty, which generally requires that Board members make decisions based on the best interests of the Company's shareholders and without regard to any personal interest.

51.     Furthermore, the Company's Governance Guidelines state, *inter alia*, that the Board is responsible for assessing major risks facing the Company and is responsible for reviewing options to mitigate such risks and oversee the processes to maintain the utmost integrity and proper management of the Company.

### 2.      The Company's Audit Committee Duties

52.      According to the Company's Audit Committee Charter, the Audit Committee is tasked with assisting the Board with its oversight responsibilities by discussing the Company's major financial risk exposures, its guidelines and policies with respect to risk assessment and risk management, and the steps management has taken to monitor and control or mitigate financial risk exposures.

53.      Additionally, the Audit Committee is responsible for, *inter alia*, reviewing with management (i) the Company's technology and cyber security frameworks, policies, programs, opportunities, and risk profile at regularly scheduled meetings; and (ii) the Company's business continuity and disaster recovery plans and capabilities and the effectiveness of the Company's escalation procedures.

54.      Furthermore, the Audit Committee is responsible to discuss with the Company's management, as well as the Company's Internal Audit Department (including in executive sessions), the Company's guidelines and policies regarding risk assessment and risk management and advises management on its risk assessment approach and its prioritization of risks.

### 3.   Duties of the Company's Operations Review Committee

55.   According to the Company's SEC filings, the  primary duties of the Operations Review Committee include: (i) overseeing management's efforts to identify the causes and mitigate the effects of the Company's December 2022 operational disruption and, if feasible, to enhance and remediate the Company's processes and operations to reduce the likelihood of such a significant and prolonged disruption to flights in the future; (ii) receiving reports from management and from such third parties as management or the Operations Review Committee may deem advisable with respect to such matters and operations; and (iii) if the Operations Review Committee determines it to be advisable, recommending to the Board further enhancements of the Board's processes to oversee air carrier operations risks.

## V.   SUBSTANTIVE ALLEGATIONS

### A.   THE COMPANY

56.   SWA is a major passenger airline that, as of December 31, 2022, provided passenger service to 121 destinations in 42 states, the District of Columbia, and Commonwealth of Puerto Rico, and ten near-international countries with a fleet of 770 Boeing 737 aircraft.

57.   SWA typically operates about 4,000 scheduled daily flights, with a typical five-to-six-person flight crew, and many supporting ground roles.  Each of SWA's planes can carry 150 to 180 passengers.  The logistics of staffing more than 100 airplanes for 4,000 daily flights with appropriate flight crews is complex even in perfect weather.

58.   Most U.S. airlines operate a hub-and-spoke route structure that concentrate operations at a limited number of central hub cities that serve most spoke cites with one stop or connecting flights through a hub.

59.   Resilient, up-to-date crew scheduling infrastructure commensurate with complexity of SWA's point-to-point route structure was critical to maintaining orderly flight operations.

60.     SWA operates a point-to-point route structure, from city to city to city without a central hub which enables the Company to offer more nonstop flights.

61.     Point-to-point structures operate efficiently so long as flight schedules remain intact.  But if one or more points are disrupted, the entire structure can be adversely impacted unless the airline's scheduling infrastructure can make timely revisions to fill gaps with available aircraft and flight crews.  Schedule disruptions on point-to-point structures can be difficult to contain because airplanes and flight crews inevitably end up at airports other than where they are needed to make scheduled flights.

62.     As such, SWA, or for that matter, any airline with a point-to-point route structure requires a particularly robust and dependable scheduling infrastructure to enable the airline to recover from schedule disruptions.  SWA's senior management and Board each knew of the Company's dependance upon its crew scheduling infrastructure.

63.     Nonetheless, SWA's Board and senior management had long been technologically luddite, unwilling to devote needed investment to modernize the Company's scheduling infrastructure, particularly as it relates to systems that match airplanes and flight crews to recover from disruptions to the Company's flight schedule.

64.     For example, notwithstanding years of red flags raised by SWAPA and TWA 556 about the failings of SWA's scheduling infrastructure, in 2020 and 2021, the Company substantially reduced IT infrastructure related spending and headcount despite receiving billions of dollars in Covid relief funds.  In 2019, prior to Covid, SWA's IT infrastructure spending was $1 billion.  In 2021, the Company spent $505 million in capital expenditures, including technology projects.  In 2020, the Company spent $515 million.

65.     Similarly, despite being behind in technology, SWA significantly cut its tech workforce.  SWA includes its tech employees in a group called "management, technology, finance, marketing and clerical personnel."  From 2018 to 2021, the number of SWA employees in that group dropped about 27%, while the number of employees Company-wide dropped only about 6% during that same period.

66.     As CEO Bob Jordan conceded, prior to the December 2022 operational meltdown, SWA was behind in technology.  Indeed, that technological deficit was years in the making.

**B.     SWA's Outdated Mission Critical Scheduling Infrastructure**

67.     At all relevant times, SWA relied on software referred to as SkySolver for assigning pilots and flight attendants to specific flights.  SkySolver is an off-the-shelf software application SWA customized.  According to the Company, SkySolver is nearing the end of its life.

68.     PAOP.org reported:

 SkySolver, is old… ancient by any standard.  Imagine telling your clients you run your operation on Windows 3.1 (1992).  This is not an exaggeration – that is equivalent to what [SWA] is using to manage its operations.

69.     SkySolver was developed decades ago and is now owned by General Electric Co. In the 1990s, when SkySolver was developed, its design was based on the maximum computing power at the time.  As computing power increased over the years SkySolver did not take advantage.

70.     At all relevant times, SkySolver could simultaneously process only 200 to 300 schedule changes, a very low capability given contemporary IT standards as well as the size and complexity of SWA's point-to-point flight operations.

71.     SWAPA vice president, Captain Michael Santoro ("Capt. Santoro") said regarding SWA's crew scheduling technology:

is just not adequate enough for the size that [SWA is] as an airline now or the complexities of the network.

16

The Company hasn't invested the money into scheduling infrastructure to support the network they have developed.

72.     When SWA's decades old SkySolver software ceases to function due to capacity limitations or other failures as it does during even mild schedule disruptions, SWA's crew schedulers revert to the tedious and untenable process of manually, with paper and pencil, assigning and reassigning pilots and flight attendants to flights.

73.     At all relevant times, SWA relied on telephone calls or face-to-face contact when crew members were reassigned to a different flight or even to change hotels.  SWA must call pilots and flight attendants or chase them down in the airport to communicate re-assignments.

74.     At all relevant times, SWA relied upon a "recovery optimization engine" referred to as "Baker" to generate adjustments to flight schedules to recover from disruptions to the Company's pre-planned flight schedule.

75.     Baker, however, did not interface well with flight crew scheduling data processed by SkySolver.  When confronting schedule disruptions, Baker was known to generate schedule revisions that were in conflict with and incompatible to schedule revisions generated by SkySolver.

76.     Despite known limitations and propensity of SWA's scheduling infrastructure to fail to properly function during schedule disruptions exposing the Company to financial and reputational harm, the Individual Defendants were unwilling to undertake necessary upgrades to newer more capable and resilient technologies.

77.     TWU 556's Montgomery said regarding the willingness to make needed investments to bring SWA's scheduling infrastructure up to date:

It almost became a running joke around the Company that we [SWA] aren't able to make certain changes because it would involve technology.

C.      THE CATASTROPHIC MELTDOWN OF SWA'S SCHEDULING INFRASTRUCTURE

     1.    Wednesday, December 21, 2022

78.     On Wednesday, December 21, 2022, in advance of Winter Storm Elliot, a cross-country storm that originated in the Pacific Northwest forecasted to bring heavy snow to several states and strong winds and cold temperatures to the eastern two-thirds of the Lower 48, SWA announced the following travel update:

> We have reduced operations at some airports we serve, primarily Denver and Chicago Midway.  Of the nearly 8,000 scheduled flights for both Thursday, Dec. 22 and Friday, Dec. 23, Southwest has canceled about 500 flights.

     2.    Thursday, December 22, 2022

79.     In the early morning of December 22, 2022, the number of SWA flight cancellations quickly increased as the Company's scheduling infrastructure struggled to handle reassigning flight crews and airplanes from the prior day's 500 flight cancellations.

80.     The Company publicly announced:

> Southwest continues to alter its operational plan as Winter Storm Elliott affects a number of airports in our Network.
>
>        *   *   *
>
> Most of these disruptions were proactive schedule adjustments to ensure safe operations, to protect the integrity of the entire Southwest Network, and to limit prolonged exposure in dangerous working conditions.  However, the changing operational environment and treacherous conditions led to additional later cancellations.

81.     The increasing number flight cancellations exceeded SkySolver's capacity to process 200 to 300 simultaneous schedule changes on top of the increasing number of flight cancellations as the day progressed.

82.     Because of limited processing ability, among other things, SWA's scheduling infrastructure failure began during the Company's flight schedule adjustments in advance of Winter Storm Elliot.

83.     The disparity in the number flights cancelled by SWA relative to its competitors was evident from the get-go.

84.     SWA cancelled 966 of its flights scheduled for December 22, more than 24% of all SWA flights scheduled for that day.   According to *Forbes.com*, SWA cancelled double the combined number of flights cancelled by United Airlines (141), Delta Airlines (139) and American Airlines (139) combined.   In addition to the 966 cancellations, many more SWA flights experienced long delays.

85.     A December 22 letter from SWAPA to its members stated that SWA was experiencing a "systemic meltdown."   Pilots were being assigned last-minute extra flights and reroutes.  The SWAPA letter further stated:

> Each time a disruption affects the [scheduling] network, the failure of process and a crumbling infrastructure just make it worse.  It then falls on every frontline employee to pick up the pieces.

86.     The Company made no public mention that SWA's outdated and inadequate scheduling infrastructure, in significant part, caused SWA's disproportionately high number of flight cancellations.

87.     Despite its scheduling infrastructure being in a tailspin, SWA merely said that plans for additional flight cancellations for Friday, December 23 were "in flux."

### 3.     Friday, December 23, 2022

88.     On December 23, 2022, SWA continued to cancel flights at rates faster than the Company's inadequate scheduling infrastructure could recover from the disruption.

89.     SWA further lost the ability to effectively and timely track the location of the Company's pilots and flight attendants and its ability to manage hotel accommodations for stranded flight crews.

90.     SWA flight crew members rely on phone systems during schedule disruptions to call in for reassignments.  As of December 23, many SWA flight crew waited hours for reassignment.  Eventually crew members hit limits on the number of hours they could work without rest, a problem both union leaders reported and the Company acknowledged.

91.     Stranded SWA flight crew members and passengers were left to compete on their own for the same scarce hotel rooms.

92.     SWA's lack of capacity to track flight crews waiting for hours at airports or to arrange hotel rooms to get its flight crews rested and ready to fly further impaired the Company's ability to staff and operate scheduled flights or recover from its already disrupted schedule.

93.     Internally, in a detailed memo, SWA vice president of flight operations, Lee Kinnebrew ("Kinnebrew"), blamed the Company's then-system-wide staffing issues on SWA pilots' sick calls, fatigue rates, and overtime flying.

94.     SWA continued to state publicly that its outsized, disproportionately high number of flight cancellations were merely proactive steps by the Company due to weather conditions:

> We continue to proactively manage and update our operational plan and flight schedules in response to Winter Storm Elliott. With more than half of the airports where we operate in the continental U.S. under duress from the storm, Southwest has been uniquely affected given our size and structure.
>
> As it remains a very dynamic situation, we don't have specific numbers to share on flight disruptions, but the storms have forced hundreds of cancelations throughout our network.

95.     Southwest cancelled 950 of its flights scheduled for December 23, the most flight cancellations of any airline by far.

96.     In an internal message to SWA employees during the evening of December 23, Kinnebrew wrote that because of improving forecasts, weather on December 24 lent itself to better conditions for SWA customers and employees.  Kinnebrew added:

> as the Company moves into the weekend and next week, we need all hands on deck to run the operation and protect the Crew Network . . . We expect a much-improved operation on Christmas Eve.

### 4.     Saturday, December 24, 2022

97.     On December 24, 2022, despite improved weather forecasts, operations at SWA fell further into disarray.

98.     Defendant Watterson stated that continued flight schedule disruptions left:

> many Crews to finish later than planned or end up being out of place.  That left us [SWA] starting today [Saturday] with Crews still in rest, with others out of position, and no choice but to implement additional cancellations.

99.     Instead of flying SWA passengers, the Company was flying hundreds of ferry flights to move crew members on the same routes SWA had cancelled.  Other than crew members being transported, ferry flights operated empty.  So stranded SWA passengers watched 737s depart empty headed for those passengers' destinations.

100.     On December 24, 2022, Kinnebrew said SWA had begun offering premium pay to pilots and flight attendants but said people are picking up trips at lower-than-normal rates.

101.     In days prior, to save money, SWA operations would only use reserve pilots to fill vacancies and rejected pilots who volunteered to work overtime.  Now, SWA's offer to incentivize crew members to work overtime was too close to the Christmas holiday to make a meaningful difference, even assuming the Company could effectively schedule flights, which it could not.

102.     Lines of communication between SWA scheduling and SWA crew members had broken down.  Telephone lines to SWA crew scheduling were so jammed crew members spent hours on hold trying to reach a human assuming they ever did.

103.   SWA stopped generating crew schedule updates.   Aircraft Communication Addressing and Reporting System ("ACARS") message from Southwest flight operations to Southwest airplane cockpits stated:

> No updates here.  [SWA] Scheduling is so far behind we were told we weren't allowed to walk over and talk to them.

104.   Watterson wrote in an internal message that the Company was developing a plan to reduce operations Saturday night at several airports in hopes of relieving stress on the network and starting in a better position Sunday.  That plan never materialized.

105.   SWA's lack of ability to communicate with its flight crews on duty at airports continued overnight Saturday. Some flight attendants were left without hotel accommodations and slept on cots in airport crew lounges.

106.   SWA vice president of inflight operations, Sonya Lacore, messaged flight attendants about the operational chaos:

> I don't have an apology big enough to change what you've experienced already.

107.   The Company still said nothing publicly about its non-functioning scheduling infrastructure or its impact on SWA's continuing outsized flight cancellations:

> We continue to proactively manage and update our operational plan and flight schedules in response to Winter Storm Elliott, and we are grateful for the support of our Employees as we work to stabilize our network. . .
>
> As it remains a very dynamic situation, we don't have specific numbers to share on flight disruptions, but the storms have forced thousands of cancellations throughout our network.

108.   Southwest cancelled more than 38% of flights it had scheduled for December 24.

5.      **Sunday, December 25, 2022**

109.    On December 25, 2022, Southwest said clearer weather and fewer disruptions aided its efforts to route planes and crew to the right locations.  Nevertheless, the Company's out of control flight cancellations persisted.

110.    Capt. Murray explained that SWA's scheduling of pilots and flight attendants became chaotic when the systems couldn't keep up with the schedule changes:

> We have crews stuck, and scheduling doesn't know where they are.

111.    Capt. Murray continued, SWA pilots booked their own hotels when the Company didn't assign them.  SWA instructed to call a specific number at SWA to request a hotel when they do not have a room and are not at their home base.  The phone lines were so backed up there was no way to get through to a human.  SWAPA instructed pilots to book their own hotel room after waiting on hold for more than 30 minutes and expense the cost back to the Company.

112.    In an internal December 25 message to employees obtained by CNN, Defendant Jordan, acknowledged Murray's comments.  Jordan said the Company was experiencing "a lot of issues in the operation right now."   Jordan also acknowledged the Company's out-of-date scheduling systems were in part to blame for SWA's operational failures.  Jordan told employees:

> Part of what we're suffering is a lack of tools. We've talked an awful lot about modernizing the operation, and the need to do that.

> \* \* \*

> We need to be able to produce solutions [to schedule disruptions] faster.

113.    Defendant Watterson told employees that the Company's crew scheduling systems were "overmatched in situations of this scale."  The Company's scheduling systems could not function with the number of changes encountered.

114.    SWA's crew schedulers had to attempt to revise and update crew schedules manually, with paper and pencil.  Manual attempts to revise the Company's flight schedule, matching flight crews with airplanes, also overwhelmed SWA's crew scheduling staff.

115.    According to CNN, a transcript of a call Defendant Watterson conducted with employees explained that SWA crew schedulers worked furiously to put a new schedule together, matching available crew with aircraft that were ready to fly.  Defendant Watterson explained:

> The process of matching up those crew members with the aircraft could not be handled by our technology.

116.    Southwest ended up with planes that were ready to take off with available crew, but the Company's scheduling software was not able to match them quickly and accurately.

117.    As a result, SWA had to ask its crew schedulers to create a schedule manually, and "it's extraordinarily difficult, a tedious, long process."  Watterson said:

> They would make great progress, and then some other disruption would happen, and it would unravel their work . . . So, we spent multiple days where we kind of got close to finishing the problem, and then it had to be reset.

118.    With regard to SWA's plan for flight operations, an ACARS message reported:

> They [SWA] are going to fly whatever we can with legal crews tonight and then park the fleet and try to regroup over the next few days.

119.    As of Sunday evening, SWA had cancelled more than 1,000 flights, about 30% of the airline's entire schedule for December 25.

### 6.    Monday, December 26, 2022

120.    On December 26, 2022, weather in much of the U.S. had much improved.  Nonetheless, SWA could not recover.  The Company continued to cancel huge numbers of flights.

121.    A 9:09 AM tweet by SWA on December 26 directed customers to self-service options regarding flight rebookings:

We continue to experience high call and social inquiry volumes. Please check your flight status and explore self-service options here: https://swa.is/Dec2022

122.    SWA's tweet had more with 1.7 million views and 1,000 replies – many of them

angry.  One of the replies in part read:

Stop blaming the WEATHER!  Had to buy a first-class ticket on another airline but it TOOK OFF ON TIME!  You still have our luggage with medication inside! Can't get through on the phone!

123.    Kyle Potter, executive editor of *Thrifty Traveler*, on December 26, said:

. . . with many areas seeing clear skies on [December 26], the airline [SWA] would seem to have few obvious reasons to cancel so many flights.

124.    Potter described SWA's operating status as a "full-blown meltdown." Potter said,

"This is really as bad as it gets for an airline."

125.    SWA, however, continued to blame the meltdown on the weather.  The Company

stated:

We were fully staffed and prepared for the approaching holiday weekend when the severe weather swept across the continent, where Southwest is the largest carrier in 23 of the top 50 travel markets in the U.S. These operational conditions forced daily changes of an unprecedented volume and magnitude to our flight schedule and the tools our teams use to recover the airline remain at capacity.

126.    SWA further stated on December 26:

While I don't have figures from specific airports where we operate, we are still experiencing disruptions across our network as a result of Winter Storm Elliott's lingering effects on the totality of our operation.  With the weather now considerably more favorable, we continue work to stabilize and improve our operation.

127.    During a December 26 interview on ABC News, Capt. Murray summarized the

state of SWA's flight operations:

It's been catastrophic.  It's been a failure at every level at Southwest.  Our processes, our IT, our infrastructure just wasn't there to support the operation.  And unfortunately, our customers are bearing the brunt of it.

128.    Capt. Murray said there are hundreds of SWA pilots across the country hoping to get on flights, but they are having trouble getting through to the Company's scheduling team.  In some instances, pilots are showing up at airports and SWA management is taking a roll call of who is there.  Capt. Murray said, "We've got [SWA pilots] not only waiting for assignments, but SWA scheduling doesn't know where they are at."

129.    Montgomery said with regard to Southwest flight cancellations:

It's been complete and utter chaos.  This is not a staffing issue, this has nothing to do with flight attendants not being able to work, it has to do with archaic, outdated [scheduling] systems.

130.    Local 556 also issued a statement:

Southwest Airlines has failed its employees once again, the result of years of refusal to modernize operations . . . And this time, it's on Christmas.  While Southwest COO Andrew Watterson admitted its current systems are "overmatched" by Winter Storm Elliott, the union points to years of neglect in securing and implementing technology that would make the difference for flight crews, employees and also customers.  The result: thousands of crew members stranded across the country, some forced to sleep on cots in airports, some in hotels without power or water, and far too many working long hours well past acceptable duty days, and more.  Trying to get home for Christmas seems like a dream to flight attendants who are struggling with the nightmare of simply trying to secure appropriate shelter, food and rest.

*  *  *

This impacts lives and threatens safety for all. [Local 556] has for years demanded that Southwest Airlines seek technological solutions to match its rapidly expanding operation.  The lack of technology has left the airline relying on manual solutions and personal phone calls, leaving flight attendants on hold with Southwest Airlines for up to 17 hours at a time simply to be released to go home after their trip, or while attempting to secure a hotel room or know where their next trip will be.  While reroutes and rescheduling are understood to be a part of the job in the airline industry, the massive scale of the failure over the past few days points to a shirking of responsibility over many years for investing in and implementing technology that could help solve for many of the issues that plague flight attendants and passengers alike.

131.    As the SWA flight cancelations continued to pile up throughout the day, announcements were made at airport after airport warning stranded SWA customers it would likely be several days before they could be rebooked on new flights.

26

132.    Similar to SWA pilots and flight attendants, customers could not get through to SWA customer service via telephone.  SWA posted on its website notice to stranded customers that its phone lines were overwhelmed.  SWA blamed the weather:

> Our teams have worked throughout the night and have successfully doubled our capacity on our phone line at 1-800-I-FLY-SWA.  Though, due to the high demand from Winter Storm Elliott, we are still experiencing high call volumes which may result in busy signals.  If you are not traveling within the next 72 hours, and can wait to call, please do so.  If you need to reach us urgently, you may continue to call.  Due to the very high demand from Winter Storm Elliott, our hold times are currently averaging more than 2 hours and have been as high as four hours. . .

133.    According to *CNN Wire*, calls made Monday afternoon by CNN to SWA's customer service telephone lines did not go through, so customers couldn't even get in the queue to speak to a Company representative.  SWA, however, told CNN its customer service was "fully staffed to answer calls."

134.    SWA responded to the widespread passenger frustration and travel woes in a statement:

> With consecutive days of extreme winter weather across our network behind us, continuing challenges are impacting our customers and employees in a significant way that is unacceptable.

> We are working with safety at the forefront to urgently address wide-scale disruption by re-balancing the airline and repositioning crews and our fleet, ultimately to best serve all who plan to travel with us.  And our heartfelt apologies for this are just beginning.

135.    Montgomery said, "They [SWA] are trying to stop the dominoes falling,"

136.    Montgomery said during a December 26, CNN interview:

MONTGOMERY: Well, I was just listening to the customer, Southwest Airlines customer that you were speaking with.  And I'm so sorry that that is happening to her.  The same thing is happening to Southwest Airlines flight attendants and flight crews.  The phone systems that the company uses is just not working.  They're just not manned with enough manpower in order to give the scheduling changes to flight attendants and that's created a ripple effect that is creating chaos throughout the nation.

BROWN: Right. Because it also seems like the issue is not just the winter storm, right?  It seems like there's a bigger issue with staffing.  I mean, a plane can't take off without staff, right?

MONTGOMERY: This is not a staffing issue.  This is a systems issue.  Southwest Airlines was staffed.  Its employees were ready to go to work.  But when they chose to take flights into the middle of the storm or not preemptively cancel enough flights, their systems have not been able to keep up with the rescheduling, the cancellations, the notification to crew members about those cancellations and changes in flights.

We've had flight attendants on hold for up to 12, 17 hours in some cases and unable to get hotel rooms.  They've been sleeping in airports.  And we've also had issues with being booked – rebooking.  There were some issues with the rebooking systems.  This is a systems failure led by the executive leadership of Southwest Airlines and it's time they make it right.

BROWN: And how do they make it right, exactly?

MONTGOMERY: Well, Bob Jordan today – yesterday actually, sent a message to all employees talking about the systems, modernizing the systems and needing to do that.  We need more than just talking about that.  We need to see an action plan of what Southwest Airlines is going to do to make sure that it can operate under irregular operations during inclement weather, storms, hurricanes or they should make better decisions when choosing to cancel flights.

We all hate to cancel flights.  Nobody wants to cancel a flight.  We all need to get where we need to go.  But if you cannot handle it and the result is that thousands of people, including customers and crew are going to be waiting hours and hours on end to find out what to do, then you should cancel preemptively.

137.   CNN stated that after reports emerged that SWA failed to "properly support customers experiencing a cancellation or delay", for example some customers reported being left on hold for up to 10 hours trying to reach SWA representatives and other customers separated from their luggage for several days, the DOT criticized SWA.

138.   The DOT tweeted:

USDOT is concerned by Southwest's unacceptable rate of cancellations and delays & reports of lack of prompt customer service.  The Department will examine whether cancellations were controllable and if Southwest is complying with its customer service plan.

 TransportationGov (@USDOT) December 26, 2022.

139.    The DOT further said:

As more information becomes available the Department will closely examine whether cancellations were controllable and whether Southwest is complying with its customer service plan as well as all other pertinent DOT rules.

140.    Defendant Watterson explained SWA's predicament in a December 26 internal memo to employees:

We had aircraft that were available, but the process of matching up those crew members with aircraft could not be handled by our technology.

*   *   *

In our desired state, we have a solver that would be able to do that very quickly and very accurately.  Our system today cannot do that.

*   *   *

Big problems compounded by many moving variables bog down systems trying to solve them.

*   *   *

Although we need automation to recover from something of this scale, in some functions, automation also develops issues that need troubleshooting and fixing, and that requires a manual workaround until they're solved.

141.    Similarly, Defendant Jordan told employees of December 26, "We [SWA]can't be our size and scope and have a lack of tools."  Jordan said in recent months that the Company needs to make large improvements to technology infrastructure to prevent large-scale cancellations, particularly those that reschedule flight attendants and pilots.

142.    During a December 26 evening news conference at Hobby Airport in Houston, SWA spokesperson, Jay McVay ("McVay"), told stranded passengers that flight cancellations were not due to personnel.  McVay said what started as delays from this week's winter storm turned into cancellations, and once those started piling up, crews and planes were out of place and not in the cities they needed to be.

29

143.    McVay said the cancellations snowballed as storm systems moved across the country, leaving crews and planes out of place:

> So we've been chasing our tails, trying to catch up and get back to normal safely, which is our number one priority, as quickly as we could . . . And that's exactly how we ended up where we are today.

144.    Capt. Santoro during a December 26 interview with *Politico* gave a different reason for why so many Southwest flights were cancelled:

> Our [Southwest's] IT for our scheduling software is vastly outdated . . . , Santoro It can't handle the number of pilots, flight attendants that we have in the system...

145.    In an internal message to SWA employees on the evening of December 26, Defendant Watterson wrote that SWA is cutting a third of its flights in the coming days to try to get flight attendants and pilots back in position to reset its operations.  Watterson said, "It's a move that could help stabilize operations, but will also reduce flying options for thousands of stranded passengers heading into another busy travel week."

146.    As of Monday evening, Southwest had canceled more than 2,905 flights, about 71% of all its scheduled total, according to the tracking website FlightAware, more than ten times higher than Delta which had the second most cancellations with 265.  Additionally, the airline had 681 delayed flights, accounting for another 16% of its schedule.

147.    Also as of Monday evening, Southwest had cancelled 2,400 flights scheduled for Tuesday, December 27, the lion's share of the 2,600 flight cancellations by all U.S. airlines.

### 7.    Tuesday, December 27, 2022

148.    As of December 27, 2022, Southwest's competitor airlines had resumed normal operations.  According to the *Associated Press*, American, United, Delta and JetBlue canceled between zero and 2% of their flights scheduled for December 27.

149.    In contrast, Montgomery said:

30

Southwest Airlines is basically imploding . . .  It's like our operation is a bunch of dominoes that we set up to fall, and once one domino falls, they all follow.

150.    Kyle Potter, executive editor of the travel website, *Thrifty Traveler*, said:

At this point, we can very safely say that this is no longer a weather-related disturbance.  We've had clear skies in the United States for several days now, more or less, and Southwest is the only airline that is failing so spectacularly here.

151.    The unique, longstanding factor that exacerbated SWA's flight cancellations and lack of ability to recover from schedule disruptions is the Company's outdated scheduling infrastructure that stopped functioning.

152.    Capt. Santoro told the *Star-Telegram*:

What it comes down to is our IT infrastructure and our scheduling department is not adequate to keep up with our complex point to point network.  So you can't keep track of pilots and flight attendants and airplanes and how we all match up together.  When pilots and flight attendants get in the wrong places, or don't make connections, it's overwhelmed and can't keep up with all the changes.

153.    Capt. Santoro told CNN on December 27 that the problems facing SWA were the worst disruptions he'd experienced in 16 years at the airline.

154.    Capt. Santoro added:

It is frustrating for the pilots, the flight attendants and especially our passengers.  We are tired of apologizing for Southwest, the pilots in the airline, our hearts go out to all of the passengers, they really do.

\*   \*   \*

It's been a nightmare, resulting in hours-long wait times for crew members to get scheduled on flights.

155.    SWA's system for booking pilots, flight attendants, and crews for its flights is easily overwhelmed during schedule disruptions when many crew members have to call in to be reassigned.

156.    When a flight is canceled and crew members have to be reassigned, the software must run a new solution, but it's not able to keep up with the amount of cancellations and track down personnel.  SWA crew scheduling infrastructure can only handle up to 200 scheduling changes at a time.

157.    Capt. Santoro said there are two to four hour wait times for pilots to get through to be rerouted:

> There's a huge backlog in our phone systems.  There's not a lot they [SWA] can do other than cancel the flights and try to recover the system.

158.    Santoro told *Insider* that the SWA's scheduling infrastructure is having so many issues, crew schedulers are sorting out reassignment of flight crews by hand:

> We had four [flight attendants] ready to work, but the [SWA] system didn't know where they were, so they canceled the flight, but they didn't have to.

159.    In the past three years of negotiations, SWAPA proposed a contract that includes scheduling infrastructure improvements to enable Southwest pilots be more efficient.  SWAPA wants Southwest to invest in better infrastructure and upgrade the scheduling software.

160.    SWA has had a meltdown like once a year for the past five or six years and during every annual after-action review, SWAPA would warn SWA operations that the Company's crew scheduling software and systems need to be updated and fixed.  But those pleas were made to no avail.

161.    Capt. Santoro said:

> They [SWA management and Board] never update it.  They never invest the money and resources they need to.  So, we [SWA] continue to have these [meltdown] issues.

162.    *Newsweek.com* reported that Capt. Santoro has been telling SWA "for years" that the operational chaos because of crew scheduling IT failures was "bound to ensue." Capt. Santoro said:

It's finally time that [the SWA management and Board] hopefully learned that they need to actually do this this time, invest the money and get it done.

163.    Similarly, SWAPA's Capt. Murray said that the scheduling problems SWA encountered in December had been brewing a long time.  Capt. Murray told CNN:

We've been having these [scheduling] issues for the past 20 months. . . We've seen these sorts of meltdowns occur on a much more regular basis and it really just has to do with outdated processes and outdated IT.

164.    Capt. Murray added that Southwest's operations have not changed much since the 1990s:

It's phones, it's computers, it's processing power, it's the programs used to connect us [flight crews] to airplanes—that's where the problem lies, and it's systemic throughout the whole airline.

165.    Many of the resulting problems could have been anticipated if SWA senior managers and Board implemented remedies that SWA pilots and other employees suggested for years.

166.    Atmosphere Research Group airline industry analyst Henry Harteveldt said with regard to SWA's December flight cancellations:

This is the worst round of cancellations for any single airline I can recall in a career of more than 20 years as an industry analyst.

Southwest had been slow to introduce new systems that would help it run its business . . .Southwest has never viewed technology as a strategic priority . . .

167.    Helane Becker, an aviation analyst with Cowen, an investment bank and financial services company, agreed that SWA needs to bring the Company's internal software systems up to date:

It's not only their customer-facing systems, it's their crew scheduling and so on.

Southwest has always been a laggard when it comes to technology.

168.    On December 27, SWA announced that it was still cancelling additional flights:

With consecutive days of extreme winter weather across our network behind us, continuing challenges are impacting our Customers and Employees in a significant way that is unacceptable.

And our heartfelt apologies are just beginning.

\* \* \*

. . . As we continue the work to recover our operation, we have made the decision to continue operating a reduced schedule by flying roughly one third of our schedule for the next several days. . .

169.    During a December 27 appearance on CNN, U.S. Transportation Secretary Pete Buttigieg ("Buttigieg") said that SWA had created an "unacceptable situation."  Buttigieg added, "While all of the other parts of the aviation system have been moving toward recovery and getting better each day, it's actually been moving the opposite direction with this airline [SWA]."

170.    Buttigieg said, "Their [SWA's] system really has completely melted down" and that he "made clear that our department [the DOT] will be holding them [SWA] accountable for their responsibilities to customers, both to get them through this situation and to make sure that this can't happen again."

171.    Buttigieg told CNN, "From what I can tell, Southwest is unable to locate even where their own crews are let alone their own passengers—let alone baggage."

172.    Buttigieg told CNN the DOT is prepared to pursue fines against SWA if there is evidence that the Company failed to meet its legal obligations and added that the DOT will be taking a closer look at consistent customer service problems at SWA.

173.    Montgomery said she had spoken Tuesday with Buttigieg to discuss the breakdown at Southwest. She said that SWA's technology was a major cause of the meltdown and that TWU 556 had long pressed the Company's leaders to improve it.  Montgomery said:

We are going to make sure that we keep Southwest Airlines executives accountable for what's happening so that the airline that we helped make successful is going to be reliable and stable once again.

34

174.    Buttigieg told CNN that SWA had promised the DOT in writing last summer that SWA would "take care of customers" during delays and cancellations:

> Now that we have those commitments that were made to us over the summer, we're going to be using that as a tool to hold them accountable. And I made that clear to Southwest leadership. Now... the CEO pledged to me that they will not only meet but they will exceed the customer service standards and commitments that they have made to us in the past and that we're in a position to enforce.

175.    Buttigieg said, "You've got a company here that's got a lot of cleaning up to do."

176.    Buttigieg told CNN "If you're a passenger in this situation right now, you're entitled to a cash refund if your flight is canceled and you're not traveling." Buttigieg added:

> When you're in this situation and the airline [SWA] is responsible, which is clearly the case right now, then you can get those kinds of vouchers for hotels, restaurants. What I talked about with the Southwest CEO is that a passenger shouldn't have to request that, they need to be proactively offering that.

177.    Buttigieg told ABC, "What we're seeing is something that is beyond what can be attributed to the weather." Buttigieg explained:

> every other airline began to recover over the weekend; right now, cancellation rates across the system for all of the other airlines together are averaging about 5%. With Southwest, it's more in the neighborhood of 60 to 70% . . .

178.    Buttigieg said on ABC News Nightline:

PETE BUTTIGIEG: It's a shocking and unacceptable level of disruption, combined with passengers being unable to get anybody on the phone to help them.

BYRON PITTS (ABC NEWS): (Off-camera) Mr. Secretary, could Southwest face consequences for failing its customers beyond what you've laid out?

PETE BUTTIGIEG: We're taking a look at all of that, right now. There are a number of responsibilities they have, and things that we can enforce in terms of the way that they treat their customers and how their operations roll out.

179.    Buttigieg posted a video to his Twitter account that said:

Southwest Airlines needs to do everything it takes to get stranded passengers to their destinations – and cover their expenses (like meals, hotel, ground transport) in the meantime. We'll continue to hold them accountable with all tools available to USDOT.

180.     Even President Joe Biden posted on Twitter to state that his administration will hold

SWA accountable:

> Thousands of flights nationwide have been canceled around the holidays. Our
> Administration is working to ensure airlines are held accountable.
>
> If you've been affected by cancellations, go to @USDOT's dashboard to see if
> you're entitled to compensation. https://t.co/r0YBCPyKes
> https://t.co/1ZdqhBOAoL
>
> — President Biden (@POTUS)

181.     On December 27, 2022, U.S. Senator Maria Cantwell (D-Wash.), Chair of the

Senate Committee on Commerce, Science, and Transportation, released the following statement

regarding Southwest Airlines' cancellation of thousands of flights:

> The problems at Southwest Airlines over the last several days go beyond weather.
> The Committee will be looking into the causes of these disruptions and its impact
> to consumers.  Many airlines fail to adequately communicate with consumers
> during flight cancellations. Consumers deserve strong protections, including an
> updated consumer refund rule.

182.     Also on December 27, U.S. Senators Edward J. Markey (D. Mass) and Richard

Blumenthal (D Conn.) stated, in relevant part:

> Southwest cannot avoid compensating passengers by claiming these flight
> cancellations were caused by recent winter storms. As Southwest executives have
> acknowledged, the mass cancellations yesterday were largely due to the failure of
> its own internal systems.  As such, those cancellations should be categorized as
> 'controllable,' and Southwest should compensate passengers accordingly.

183.     The senators pointed out Southwest can well afford to compensate passengers,

given its planned $428 million dividend slated for stockholders next year.

184.     According to the *Morning News.* Defendant Jordan was on track to earn $9 million

in total compensation when he took over as CEO earlier this year,

185.     Rep. Rick Larsen of the State of Washington, who will be the top Democrat on the House Transportation Committee next year, said that he'd spoken with officials at Southwest, who told him cancellations as of Christmas Eve were "deemed controllable," meaning passengers are entitled to refunds and reimbursements as a result of SWA's meltdown.

186.     SWA told USA Today that the Company's scheduling infrastructure "could not align our [SWA's] resources.  The Company stated that:

> As a result, our crew schedulers are tackling the issue manually and that is a tedious, long process that takes time and trained resources to accomplish.

187.     Late December 27, Defendant Jordan had his first on-camera appearance about the problems, in which continuing bad weather quickly overwhelmed SWA's crew scheduling system, leaving crews stranded and planes parked as the system struggled to match flight crews to airplanes.

188.     Defendant Jordan announced that:

> With our large fleet of airplanes and flight crews out of position in dozens of locations, and after days of trying to operate as much of our full schedule across the busy holiday weekend, we reached a decision point to significantly reduce our flying to catch up.

189.     The Company decided to significantly reduce SWA's flight schedule by 2500 flights Wednesday, December 28 and by 2,400 Thursday, December 29.  According to Defendant Jordan, the mass cancellations were to allow SWA to "get all of the pieces back into position to end this rolling struggle."

190.     SWA said it would limit new bookings on the planes it plans to fly in the coming days, to keep people from booking flights that ultimately may be canceled and to give various systems time to sync up, it removed some seats for sale on its website.

8.      **Wednesday, December 28, 2022**

191.      In a December 28 message to TWU Local 556 members, Montgomery wrote SWA's

Christmas disruption has been:

> the operational failure of all failures.
>
> It is the complete failure of [SWA] executive leadership.  It is their decision to continue to expand and grow without the technology needed to handle it.

192.      Even as it tried to solve one set of problems, new ones would emerge.

193.      During an interview by National Public Radio's Ari Shapiro, Montgomery said:

> ARI SHAPIRO:          You said this is embarrassing and disheartening.  Let's try to pull back the curtain on what's going on.  Because yesterday, Southwest canceled almost 3,000 flights.  That is more than – 10 times more than the next airline.  So what made Southwest different from all the other airlines in this storm?
>
> LYN MONTGOMERY:          This is basically the house of cards has fallen. This is something that TWU Local 556 has told the company over the years – the pilots union has said the same thing – that we need to invest in our IT infrastructure, that the systems we have in place cannot handle the operation that we utilize today. And eventually, we're going to have a system failure so grave that something of this magnitude could happen.  And today, we have this situation where we don't even need to say the evidence anymore.  It's all here, that this has happened.
>
> ARI SHAPIRO:          You said it was an IT failure. Can you explain, like, what exactly it is that went wrong, what it is that Southwest does differently from the others?
>
> LYN MONTGOMERY:          It's just about the systems not being able to handle the mass amount of cancellations and rescheduling that needs to occur. And the way that they have to notify their flight crews is a manual process.  Most of the notifications required, you actually have to talk to a crew scheduler.  If you have 1,200 flight cancellations and you need to talk to even half of those flight attendants, that becomes an incredibly taskful (ph) thing to do, and you can't get it done in time.  And that's why flight attendants have been on hold.

194.    On December 28, a social media post by a "Southwest pilot" attributed SWA's chaos to its "fried" crew scheduling software system.  According to the post, SWA planes are parked.  Crews are stranded in the airports with the passengers, volunteering to take the passengers in the parked planes but the Company's software won't accept it.  Phone lines are overwhelmed for both passengers and crews.  SWA pilots and crews are ready to fly, but the Company has told them that the system needs a reset and as a result are running only one-third of scheduled flights. Gate agents are in tears. They've been yelled at, cussed at, slapped and spit on.  Flight attendants have been taking a beating.   The SWA frontline employees have had little support or communication.  Terminals are standing room only with people having been there for days.  Pilot lounges are packed with pilots ready to fly and nowhere to go.  The Southwest pilot called the situation "embarrassing" and said in 24 years, he has never seen anything like this.  I'm going on my second of three days off, still stuck on the east coast and still expected to show up in the morning with no schedule.  And I'm willing to fly all day if needed.  Because that's nothing compared to the passengers needing meds in bags that are lost and mothers traveling with kids, having been stuck for the same amount of days in the terminal.  The rumors that there is a lack of crews and pilots are staging sick calls are untrue.  This is a computer system meltdown.  Thousands of crew members are sitting in hotels and airports with nowhere to go. This airline has failed miserably."

195.    On December 28, on ABC's Good Morning America, Buttigieg said with respect SWA's flight cancellations:

> We are past the point where they could say that this is a weather-driven issue . . . What this indicates is a system failure, and they [Southwest] need to make sure that these stranded passengers get to where they need to go and that they are provided adequate compensation.

So this is going to take an extraordinary level of effort by Southwest . . . , And we [the DOT] will mount an extraordinary effort to make sure that they're meeting their obligations.

To me, it means that in order to restore that relationship with their customers, Southwest is going to have to not only make them financially whole, but find a way to really rebuild trust and confidence.

196.    In other words, the DOT intends to require SWA to compensate passengers in the most favorable way required by law.  Buttigieg reiterated that SWA must also work to get meal vouchers, hotel stays and ground transportation in place "because this is [SWA's] responsibility."

197.    Buttigieg said, Defendant Jordan pledged that SWA would meet its commitments to its customers, and "we [the DOT] will be watching closely to make sure that actually happens."

198.    Rep. Greg Stanton who serves on the House Transportation and Infrastructure Committee and its Aviation Subcommittee said that Congress must hold hearings for Southwest Airlines' CEO Jordan to explain why the airline has had two major episodes of flight cancellations within 14 months–leaving tens of thousands of travelers stranded in airports throughout the nation. Rep. Stanton said:

Twice now over just 14 months, Southwest's negligence has forced it to cancel an extraordinary number of flights and leave tens of thousands of passengers stranded without answers.  Its apparent failure to adequately prepare for or respond to foreseeable circumstances has created a paralyzing system-wide collapse. Southwest's leadership, including CEO Robert Jordan, must explain to the American people and the House Transportation and Infrastructure Committee why it has failed to invest in its IT infrastructure, adequately staff airline operations, or to learn hard lessons from past challenges.

199.    Between Dec. 22 and 28, SWA canceled 13,353 flights, affecting millions of people during one of the busiest travel stretches of the year.

200.    On December 28, according to an internal SWA memo viewed by *Insider,* to help with crew scheduling, employees at SWA's Dallas headquarters were asked to volunteer for one of three possible eight-hour shifts that will operate 24 hours a day.  The shift would be worked instead of each employee's normal day-to-day duties.

201.    The Company's crew schedules are responsible for ensuring each SWA flight is staffed with pilots and flight attendants, notifying crew members of their flight duties, and managing crew schedules.  Typically, new hires must complete extensive training to become a crew scheduler.  To prepare untrained volunteer employees, the memo said a "train the trainer" approach would be used, meaning volunteers would sit next to a scheduler to learn to the ropes.

202.    Defendant Watterson stated: "There just was not enough time in the day for them to work through the manual [scheduling] solutions."

### 9.    Thursday, December 29, 2022

203.    On December 29, SWA said it was still operating "roughly one third of its (normal) schedule."  According to FlightAware, SWA cancelled more than 2,300 flights.  That same day, Delta, American and United combined canceled approximately 30 flights.  SWA was responsible for more than 95% of all canceled flights in the United States.

204.    SWA said it had marshaled a "volunteer army" of more than 1,000 corporate employees to manually schedule crews.  Defendant Jordan said, "this has been an incredible disruption, and we can't have this again."  SWA said the volunteer crew schedulers would be on standby for any future disruptions.

205.    Congressman Jake Ellzey (R-TX-06), a former Southwest Airlines pilot and Congressman Colin Allred (D-TX-32), released the following joint statement after meeting yesterday with the presidents of three unions representing workers with Southwest Airlines.  This included the [SWAPA], [TWU 556] and Transport Workers Union 555, as well as other members of the Texas Congressional delegation.  The Congressmen jointly stated:

> There has always been strong bipartisan support in Congress for the growth of Southwest Airlines not just because it generates such a huge economic impact for our region, but also because of its storied history as the people's airline and the legacy of Herb Kelleher.

> However, it is clear that for some time Southwest has run unacceptable risks and tried to get by with an unacceptably thin margin of error both in staffing and in technology and that this crisis was both predictable and preventable.

> The payment of hundreds of millions in dividends to shareholders and a healthy profit through the first three quarters of this year clearly show that Southwest can afford to address the issues at hand but has chosen not to.

> While businesses should strive to maximize profits, it should never be at the expense of their customers.  Through mismanagement, failed infrastructure and poor planning Southwest neglected the people who keep them in business. Leaving thousands of Americans stranded over the holiday season is unacceptable.

206.    The DOT formally warned SWA that it will face consequences if it fails to do right by stranded and inconvenienced passengers.   In a December 29 letter to Defendant Jordan, Buttigieg wrote that officials will take action against SWA if it does not follow through on promises to reimburse passengers for alternative transportation costs, as well as provide meals, hotels, refunds and baggage reunification.  Buttigieg wrote that the DOT has the ability to levy fines as a penalty.

> It would be an unfair and deceptive practice not to fulfill this commitment to passengers . . . The Department will use the fullest extent of its investigative and enforcement powers to hold Southwest accountable if it fails to adhere to the promises made to reimburse passengers for costs incurred for alternate transportation.

207.    Buttigieg made similar warnings related to SWA's other commitments.

No amount of financial compensation can fully make up for passengers who missed moments with their families that they can never get back–Christmas, birthdays, weddings, and other special events . . . That's why it is so critical for Southwest to begin by reimbursing passengers for those costs that can be measured in dollars and cents.

208.    Buttigieg said on NBC News:

We [the DOT] are going to be putting Southwest Airlines under a microscope in terms of their delivering these kinds of reimbursements and refunds to passengers.

209.    In a December 29 call with journalists SWA executives said they would learn from the debacle, though they stopped short of committing to a timeline for fixing the Company's computer systems so that they can withstand large-scale weather disruptions.

210.    SWA announced on December 29 that after thousands of flight cancellations the Company planned to normal operations with minimal disruptions on December 30.

211.    In a December 29 memo to staff, Defendant Jordan wrote: "We have all hands on deck and tested solutions in place to support the restored operation.  I'm confident, but I'm also cautious."

212.    SWA is removing limits on ticket sales, rebuilding crew schedules and shuttling baggage as it gears up to resume its full flying schedule.  Southwest's top executives told employees that shrinking down had helped. The operation has stabilized, and the airline is ready to ramp back up again.

213.    Southwest said on December 29:

We know even our deepest apologies – to our Customers, to our Employees, and to all affected through this disruption – only go so far.  We have much work ahead of us, including investing in new solutions to manage wide-scale disruptions.

**10.    Friday, December 30, 2022**

214.    After eight consecutive days of massive numbers of flight cancellations stranding millions of its customers during holiday travel, SWA began operating its normal flight schedule on December 30.

215.    Defendant Jordan during a December 30 interview on Good Morning America, said the Company is making investments in our operational areas.  Like always, there'll be lessons learned from this and we'll continue to make more investments.  Jordan stated:

> . . . We're offering refunds, covering expenses. We'll be going back out with even more after that.

> . . . Southwest Airlines will be looking at and taking care of things like rental cars, hotel rooms, meals, booking customers on other airlines sold. That will all be part of what we're covering here as we reimburse our customers and make good on this issue.

> This has impacted so many people, so many customers over the holidays. It's impacted our employees. And I'm extremely sorry for that. There's just no way almost to apologize enough, because we love our customers, we love our people, and we really impacted their plans.

> . . . there'll be a lot of lessons learned in terms of what we can do to make sure that this never happens again because this needs to never happen again.

216.    Indeed, had the Board and senior management not ignored years of prior meltdowns and warnings that the Company's scheduling infrastructure was not adequate for the size and complexity of SWA's operations, the December 2022 debacle could have been avoided.

**11.    Tuesday, January 3, 2023**

217.    On January 3, 2023, Defendant Jordan issued an update on the status of SWA's recovery and the Company's process that, among other things, states:

> We disrupted holiday travel for millions when some of our systems and processes became stressed by Winter Storm Elliott, bringing disruptions that were far reaching.  We are taking immediate steps to address the massive inconvenience as well as the issues that contributed to it.

44

\* \* \*

In addition to our heartfelt apologies, we immediately began an all hands on deck effort to take care of our Customers.  We are making great progress by processing tens of thousands of refunds and reimbursements a day and will not let up until we have responded to every impacted Customer.  We also sent a goodwill gesture of 25,000 Rapid Rewards Points this week to all Customers significantly disrupted.  That goodwill gesture is above and beyond the refunds and reimbursements work that continues around the clock.

Since the moment our recovery started, we've had large teams of Employees reuniting disrupted passengers with their belongings.  I'm pleased to share that as of today, we have the vast majority of these bags either reunited or on their way to our Customers.

Our Employees came together as they always do. It's humbling to see the Southwest spirit at work under such adverse conditions.

Our Leadership team is focused on a thorough review of the disruption with all the needed resources involved, and I expect that work to be completed swiftly. We've already taken immediate actions to mitigate the risk of this ever happening again, and the review work will inform additional actions and investment as well.  We've asked our unions to participate in this review effort as well, and likewise we are in regular communication with our Board of Directors.

218.    In or about early January 2023, the Company retained crisis consultant Oliver Wyman to assist SWA in its response to its December 2022 operational meltdown and to recommend actions to prevent reoccurrence.  Defendant Watterson previously was a partner with Oliver Wyman for about twelve years.

### 12.    SWAPA Announces Intent to Call for Historic Strike Vote Authorization

219.    For years, SWAPA had unsuccessfully warned that SWA must update it inadequate IT infrastructure.

220.    On January 18, 2023, SWAPA announced today its intention to call for a strike authorization vote on May 1, 2023.

SWAPA's call for an authorization vote does not affect Southwest's operation or our ability to take care of our Customers. . . ,  We will continue to follow the process outlined in the Railway Labor Act and work, under the assistance of the National Mediation Board, toward reaching an agreement that rewards our Pilots and places them competitively in the industry.  The union's potential vote does not hinder our ongoing efforts at the negotiating table. . .

221.    On May 11, 2023, SWAPA announced that the strike authorization vote closed after just a week and a half with 98% participation and 99% of pilots voting to authorize a strike.  This historic vote from the pilot union was scheduled to run through the end of May, but Southwest's pilots made their voices heard about the Company's unacceptable operational disasters.

222.    Capt. Murray stated that the vote was "a historic day, not only for our pilots, but for Southwest Airlines" and that "[t]he  lack of leadership and the unwillingness to address the failures of our organization have led us to this point. Our pilots are tired of apologizing to our passengers on behalf of a company that refuses to place its priorities on its internal and external customers."

### D.    SWA's Fourth Quarter 2022 Financial Results

171.    On January 26, 2023, Southwest issued a press release to announce financial results for the Company's fourth quarter and year end 2022 ended December 31, 2022.  Defendant Jordan states:

Due to the operational disruptions in late December, which resulted in more than 16,700 flight cancellations, we incurred a fourth quarter pre-tax negative impact of approximately $800 million (or approximately $620 million on an after-tax basis), which resulted in a fourth quarter 2022 net loss. . .

With regard to the operational disruptions, I am deeply sorry for the impact to our Employees and Customers.  We have swiftly taken steps to bolster our operational resilience and are undergoing a detailed review of the December events.   In addition, our Board of Directors has established an Operations Review Committee that is working with the Company's Management to help oversee the Company's response.  As part of our efforts, we are also conducting a third-party review of the December events and are reexamining the priority of technology and other investments planned in 2023.

Based on current revenue and cost trends, we currently expect a first quarter 2023 net loss.

### E.    SWA ANNOUNCES AN "ACTION PLAN"

223.    On March 14, 2023, the Company announced an "Action Plan" in response to inadequate IT infrastructure capabilities that caused the operational meltdown during December 2022.  In terms of addressing the Company's technical deficit Southwest announced, among other things, acceleration of investment in IT infrastructure:

> The airline began a five-year Operational Modernization Plan prior to December 2022 with many initiatives already underway to support operational resiliency. Now, ongoing implementation of tools and technology that allow for a greater pace of recovery during extreme events will be prioritized, and the airline is, currently, budgeted to spend more than $1.3 billion on investments, upgrades, and maintenance of information technology systems in 2023.

> *    *    *

> Initiatives:

> We have already completed a software upgrade [to SkySolver] that reassigns our Crews during disruptions.

> We have already increased our phone system call capacity to better handle large call volumes from both our Flight Crews and our Customers.

> We are improving the tool responsible for electronically notifying Flight Crews of their new flight assignments and allowing them to electronically acknowledge changes in their work plan.

### F.    APRIL 18, 2023 NATIONWIDE GROUNDING OF SWA FLEET

224.    On April 18, 2023, another IT systems failure forced the SWA to ground its entire fleet nationwide leading to 2,400 delayed flights.

225.    According to the Company, a firewall failed and connection to operational data was unexpectedly lost.  The grounding of flights backed up traffic at airports from Denver to New York City and came just four months after SWA's much bigger operational meltdown over the 2022 holiday travel rush.

47

226.    The Federal Aviation Administration said that it issued a nationwide ground stop on all SWA flights at the request of the Company as it worked to resolve technical issues.  The SWA flight ban was lifted by mid-morning.

227.    Though the latest disruption was far less serious than the massive meltdown Southwest suffered in December, it raised questions about the CEO Robert Jordan's vow to upgrade and modernize the carrier's systems to prevent such breakdowns.

228.    According to the *Associated Press*, the disruption added to Southwest's reputation as an airline that has struggled more than most with technology issues.

229.    Rob Britton ("Britton"), a former American Airlines executive who teaches crisis management at Georgetown University, told the *Associated Press* the damage from the incident will be minor, but will add to the erosion of SWA's image.  Britton said SWA has underinvested in technology while growing rapidly, and it suffers from an "insular culture" that "keeps them from looking outside for solutions."

230.    December's meltdown led to an ongoing Transportation Department investigation and a congressional hearing during which lawmakers complained that Southwest provided little or no help to stranded travelers.

231.    *Associated Press* reported that Sen. Maria Cantwell, D-Wash., who led a congressional hearing regarding SWA's December 2022 meltdown, said the grounding on April 18 "is another demonstration that Southwest Airlines needs to upgrade their systems and stop the negative impacts to individual travelers."

G.    FIRST QUARTER 2023 RESULTS

232.    On April 27, 2023, Southwest issued a press release to announce financial results for the Company's first quarter 2023 ended March 31, 2023.  Defendant Jordan states:

48

As expected, we incurred a first quarter 2023 net loss that resulted from the negative financial impact of approximately $380 million pre-tax, or $294 million after-tax, related to the December 2022 operational disruption.  The majority of this impact was driven by a negative revenue impact of approximately $325 million, as a result of cancellations of holiday return travel and a deceleration in bookings for January and February 2023 travel.

### H.    THE MELTDOWN WAS AVOIDABLE

233.    In the age of computer automation, the need for an army of 1,000 volunteer corporate headquarter employees with paper and pencil making assignments and reassignments of pilots and flight attendants for 4,000 daily flights reflects a systemic failure of epic proportion.

234.    For almost a decade, SWA pilots were sounding the alarm on the Company's IT issues and flawed scheduling system only to be ignored by the Company's Board and executive management.

### 1.    Defendants Ignored Repeated Warnings that SWA's Crew Scheduling Infrastructure was Inadequate for the Company's Size and Complexity

235.    As early as 2016, the SWAPA board of directors passed a vote of no confidence on the Company's then-CEO Defendant Kelly because of Kelly's unwillingness to make adequate investments to update the SWA's IT infrastructure.

236.    Since 2016, that Company's infrastructure has further dated less reliable and prone to fail.

237.    In April 2022, Southwest pilots issued a warning that fatigue is soaring among their ranks, urging the airlines to consider this issue—along with the human mistakes it could trigger—as a safety hazard.

238.    The Southwest pilots attributed widespread fatigue in the cockpit to, among other things, mass cancellations caused by weather conditions.  Capt. Murray warned, "A lot of our delays and issues that we're having have to do more with scheduling and connecting pilots with airplanes" including "inefficient scheduling processes."

49

239.    On November 12, 2022, Capt. Murray stated during a podcast:

I fear that we (Southwest) are one thunderstorm, one ATC (air traffic control) event, one router brownout from a complete meltdown. Whether that's Thanksgiving, or Christmas, or New Year, that's the precarious situation we are in.

240.    During testimony before the U.S. Senate Commerce Committee on February 9, 2023, Capt. Murray testified that SWA turned a blind eye to repeated red flags regarding the Company's unreliable technology:

Warning signs were ignored.  Poor performance was condoned.  Excuses were made.  Processes atrophied.  Core values were forgotten.

241.    The meltdown happened because SWA management lost touch with its employees and became fixated on accounting metrics, stock buybacks, and executive remuneration.

242.    SWAPA said:

We have warned the company, we've tried to partner with them, and–and they just haven't made the investment.

243.    The meltdown was predictable and preventable, and the pilots saw it coming,

244.    According to *The Dallas Morning News*, SWA insiders said it was no surprise that the Company's archaic software failed when demand was high during the 2022 holiday travel rush and weather disrupted operations.

245.    TWU 566 also warned the Company about scheduling problems for years prior to December's chaos.

246.    Similarly, Randy Barnes, president of Transport Workers Union of America Local 555, which represents Southwest ground crews, said "If [SWA] managers had planned better, the meltdown we've witnessed in [December 2022] could have been lessened or averted."

### 2.    Defendants Ignored Prior Operational Meltdowns

247.    In addition to the warnings of SWA pilots, flight attendants and others, the Company's management and Board ignored the increasing frequency of smaller meltdowns caused by inadequate IT systems.

248.    For example, in June 2021, a technology meltdown led to SWA canceling or delaying half its flights over a day and a half.

249.    In October 2021, bad weather led to SWA rescheduling 1,800 flights over a four-day period because crews were not in the cities they were supposed to be.  Competitor airlines quickly recovered to normal operations while SWA did not.

250.    The cost to the Company for the October 2021 meltdown was $75 million.

### 3.    Senior Officials Admitted SWA's Technology Failed to Keep Pace with the Company's Grow and Complexity

251.    Just weeks before the December 2022 meltdown,[3] Defendant Jordan admitted:

> We're behind.  As we [SWA] have grown, we have outscaled and outgrown our tools . . .  At our size and scale, that's just not OK. It's not only inefficient, it's hard on our employees.  There's a lot of work to do to catch the tools up to the complexity of the airline.

### 4.    Analysts Reported that SWA Lagged Technologically

252.    Cowen & Co. analyst and managing director Helane Becker, said Southwest is not equipped to handle severe weather events:

> Historically, Southwest has underinvested in IT, in technology, and this has come back in the past to hurt them."

## VI.    DERIVATIVE ALLEGATIONS

---

[3] Notably, on February 9, 2023, just weeks after the biggest meltdown in SWA's history, CNBC reported that GE had provided software upgrades to SWA's SkySolver software that according to SWA would go live by February 10, 2023.

### A.   GENERAL DERIVATIVE ALLEGATIONS

253.   Plaintiff brings this action derivatively in the right and for the benefit of Southwest to redress the breaches of fiduciary duty, waste of corporate assets, unjust enrichment and other wrongful conduct by the Individual Defendants as alleged herein.

254.   Plaintiff owns and has continuously owned common stock in Southwest during the period of the wrongdoing alleged herein and is and was a shareholder of Southwest at the time of the transgressions complained of.

255.   Plaintiff will adequately and fairly represent the interests of Southwest in enforcing and prosecuting its rights and has retained counsel experienced in prosecuting this type of action.

256.   The wrongful acts complained of herein have subjected and will continue to subject Southwest to continuing harm because the adverse consequences of the actions are still in effect and ongoing.

257.   Wrongful acts complained of herein were unlawfully concealed from Southwest shareholders.

### B.   PRE-SUIT DEMAND

258.   Plaintiff made a pre-suit demand on the Board as required by Tex. Bus. Orgs. Code § 21.551 *et seq*.  A copy of the Demand is attached hereto as Exhibit 1. The Demand and the allegations therein are incorporated herein by reference.

### C.   THE SOUTHWEST BOARD'S REJECTION OF THE DEMAND

259.   Plaintiff made the pre-suit demand on January 24, 2023. Pursuant to Tex. Bus. Orgs. Code § 21.553, Plaintiff waited more than ninety days before filing this Complaint with the Court.

260.     Plaintiff has not received any written response to the Demand from the Board. Plaintiff's Demand has been effectively refused by the Board's refusal to formally announce they are taking any of the actions listed in the Demand. As of the filing of this Complaint, SWA has not commenced any action against any of the Defendants, nor has the Company announced formation of a Special Litigation Committee to investigate the Defendants' alleged wrongful conduct. As the Board has refused to adhere to the Demand, Plaintiff considers the Demand refused by the Board.

261.     The Demand was improperly refused by the Board, as the Board has not acted in good faith to investigate Defendants' actions in accordance with their duties to the Company under Texas law. Nor has the Board acted in good faith by ignoring Plaintiff's Demand, which explained with particularity Defendants' actions and the damage wrought upon the Company.

262.     Because the Board suffers massive conflicts of interest due to the personal culpability of Defendants Kelly and Jordan and other members of the Board, the members of the Board are not capable of advancing solely the Company's interests and not their own. Based upon the facts and circumstances described in detail herein, it is clear that the members of the SWA Board are not independent and objective and cannot deal with Plaintiff's claims in good faith based on the best interests of the Company.

263.     The members of the Board know that it is in the best interests of the Company to pursue litigation to remedy the damages suffered by the Company due to Defendants' actions, but cannot and will not pursue such litigation in good faith due to their conflicts of interest.

## VII.    SOUTHWEST'S 2022 PROXY STATEMENT

264.    At all relevant times, each of the Individual Defendants, because of their advisory, executive, managerial, and directorial positions, had access to adverse, non-public information about the Company's outdated crew scheduling infrastructure and operations, including the wrongdoing alleged herein.  Each Director Defendant that was a Southwest director as of April 8, 2022 (Biegler, Biggins, Brooks, Cunningham, Denison, Gilligan, Hess, Jordan, Kelly, Loeffler, Reynolds, Montford and Ricks), directly and/or indirectly, exercised control over the contents of the Company's Proxy Statement filed with the SEC on April 8, 2022 with notice of the Company's annual meeting to be held on May 18, 2022 (the "2022 Proxy Statement").

265.    Each director serving as of the issuance of SWA's 2022 Proxy Statement filed pursuant to Section 14(a) of the Securities Exchange Act of 1934 approved the substantive content of the Proxy Statement and/or indirectly controlled its content, including with respect to the misrepresentations contained therein and omissions therefrom.

266.    The 2022 Proxy Statement stated that the "Board is responsible for overseeing management's assessments of major risks facing the Company and for reviewing options to mitigate such risks. The Board's oversight of major risks occurs at both the full Board level and at the Board committee level."  Furthermore, the 2022 Proxy Statement stated that the Audit Committee "discusses with the Company's management, as well as the Company's Internal Audit Department (including in executive sessions), the Company's guidelines and policies with respect to risk assessment and risk management and advises management on its risk assessment approach and its prioritization of risks."

267. The 2022 Proxy Statement was materially false and misleading as it omitted to disclose, *inter alia*, that contrary to the Proxy's descriptions of the Board's and its committees' oversight functions regarding risk assessment, and contrary to the Proxy's description of the steps management had taken to monitor and control or mitigate risk exposure, and in particular, the description of the responsibilities of the Audit Committee to review the Company's technology framework, policies and risk profile, the Board and its committees failed in their fiduciary risk oversight duties. SWA had failed to control or mitigate its financial risk exposure, thus the 2022 Proxy Statement, which was solicited on behalf of the Board, materially understated the true extent of the financial and operational risks SWA's outdated IT system posed to the Company. Moreover, the 2022 Proxy Statement falsely stated that the Company adhered to specific governance policies and procedures when it did not.

268. The Company was continually exposed to massive risk as a result of the Company's outdated and inadequate technology infrastructure, thus the positive statements in the 2022 Proxy Statement described above were materially false and misleading.

269. The misstatement or omissions of the above referenced facts from the Proxy Statement were material because a reasonable shareholder would have considered them important in deciding how to vote on the various matters set forth in the 2022 Proxy Statement for shareholder action, particularly the election of Company directors. A reasonable shareholder would consider the omitted information as significantly altering the "total mix" of information made available in the 2022 Proxy Statement.

## VIII.  DAMAGES SUFFERED BY SOUTHWEST

270. The Individual Defendants, including Defendants Kelly and Jordan, in particular, failed to act in accordance with any legitimate exercise of business judgment and consistently with the fiduciary duties owed by them to SWA and its shareholders.

271.    The Individual Defendants utterly ignored numerous red flags and repeated dire warnings that the Company's IT infrastructure was not adequate given the Company's growth and complexity and therefore unnecessarily exposed the Company and its shareholders to massive losses.  Through the domineering influence of Defendants Kelly and Jordan, the Board acquiesced in the Company's reckless conduct of operating the Company at "one thunderstorm, one ATC (air traffic control) event, one router brownout from a complete meltdown."

272.    Notwithstanding the increasing frequency of operational meltdowns and the SWA unions' public outcry to modernize long outdated and inadequate IT systems set forth herein, SWA's Board failed to take steps to make take critical actions consistent with the fiduciary duties of the members of SWA's Board.

273.    The wrongdoing of each of the Individual Defendants was an essential link in the damages caused and being caused to SWA and its shareholders as a result thereof.  As a direct and proximate result of such wrongdoing, SWA has unnecessarily incurred and will continue to incur hundreds of millions of dollars, if not more than a billion dollars, in costs, losses or liabilities, as follows:

A.    FINANCIAL RESULTS

274.    CNBC reported that during a December 28, 2022 call with reporters Defendant Green said there "will certainly be an impact to the [the Company's] fourth quarter" financial results due to SWA's holiday meltdown but declined provide an estimate of how much the incident will cost the Company.

275.    CNBC reported on January 3, 2023 that Bank of America airline stock analyst Andrew Didora estimated the December 2022 debacle could cost SWA between $600 and $700 million.

276. On January 6, 2023, the Company filed a Form 8-K with the SEC which stated that as a result of the operational disruptions, the Company currently expects to report a net loss in fourth quarter 2022 driven by a preliminary estimated fourth quarter 2022 pre-tax negative impact of up to $825 million.

277. Notably, damage from the December 2022 meltdown exceeds the roughly $760 million of net income the Company reported for the first nine months of 2022.

278. On January 26, 2023, SWA announced financial results for the Company's fourth quarter and stated:

> Due to the operational disruptions in late December, which resulted in more than 16,700 flight cancellations, we incurred a fourth quarter pre-tax negative impact of approximately $800 million (or approximately $620 million on an after-tax basis), which resulted in a fourth quarter 2022 net loss . . .

279. Losses from the December 2022 meltdown continued into the Company's first quarter ended March 31, 2023.

280. On April 27, 2023, Southwest issued a press release to announce financial results for the Company's first quarter 2023 ended March 31, 2023. Defendant Jordan stated:

> As expected, we incurred a first quarter 2023 net loss that resulted from the negative financial impact of approximately $380 million pre-tax, or $294 million after-tax, related to the December 2022 operational disruption. The majority of this impact was driven by a negative revenue impact of approximately $325 million, as a result of cancellations of holiday return travel and a deceleration in bookings for January and February 2023 travel.

## B. REFUNDS FOR CANCELLED FLIGHTS

281. A significant portion of this impact is from an estimated revenue loss in the range of $400 million to $425 million.

## C. LOST TICKET SALES

282. As reflected in the Company's reported financial results, the Company has lost hundreds of millions of dollars in lost ticket sales.

### D.    LOST BAGGAGE CLAIMS

283.    Processing lost baggage claims and returning baggage to customers has cost the Company millions of dollars.

### E.    REIMBURSEMENTS FOR HOTELS, MEALS AND ALTERNATE TRAVEL

284.    The cost to the Company for reimbursing SWA customers for hotels, meals and alternate travel will likely exceed $100 million, including the administrative costs of processing those requests.

285.    CNBC reported on February 9, 2023 that SWA claims to have paid out more than 96% of the reimbursement requests, and the remaining ones have been recently submitted, Watterson said.

> Anything that was well documented and under $4,000 our representative approved on the spot" while anything above was elevated to supervisors.

### F.    DAMAGE TO BRAND AND REPUTATION

286.    Airline industry analyst Robert Mann ("Mann"), president of R.W. Mann & Co told the *Star-Telegram* regarding SWA's December 2022 mass cancellations, "It's a reputation blow". While SWA can rebound, Mann said it could take up to a year:

> Can they come back? Yes, they can, but it will take time.  This is not a life or death event. It will cost the brand a lot of money. It's a reputation blow to them.

287.    Mann said, to get customers to fly Southwest again, the airline should not only give refunds, but could also offer Southwest vouchers for $500.

288.    Indeed, on January 3, 2023, the Company told CNBC that it began offering customers whose flights were canceled or significantly delayed between Dec. 24 and Jan. 2, and who did not travel or rebook, 25,000 Rapid Rewards points, a roughly $300 value, according to SWA. A day later, SWA told CNBC that travelers who rebooked with Southwest are also eligible for the 25,000 miles.

289.    The cost to SWA for buying back customers impacted by the meltdown will likely cost the Company more than $100 million.

290.    The Rapid Rewards points are just part of the discounts, promotions and other concessions the Company will need to undertake to repair damage to the Southwest brand caused by the December 2022 operational failure.

### G.    DECLINE IN STOCK PRICE

291.    SWA's stock price has been damaged because of the Individual Defendants' breaches of fiduciary duties.   On December 20, 2022, prior to the Company's operational meltdown, the Company's common stock closed at $36.39 per share.  On December 29, 2022 when SWA announced the Company would resume its normal flight schedule, the share price had dropped to $33.38.  As the Company reported massive losses caused by the December 2022 meltdown SWA's stock price continued to decline.  As of June 12, 2023, the market price of SWA common stock closed at $31.46, still down from the stock's December 20, 2022 closing price.

### H.    INCREASED DOT SCRUTINY

292.    In December 2022, the DOT announced, among other things, that it would be putting SWA "under a microscope" in terms of their delivering these kinds of reimbursements and refunds to passengers.

### I.    CONGRESSIONAL INVESTIGATIONS

293.    On February 9, 2023 the Senate Commerce Committee commenced a hearing titled "Strengthening Airline Operations and Consumer Protections."  Defendant Jordan was asked by the Committee to testify on SWA's behalf but failed to appear because of a "scheduling conflict." Defendant Watterson appeared and admitted that crew scheduling infrastructure was responsible in significant part for SWA's December 2022 meltdown.

## J.   CLASS ACTION LAWSUITS

294.   The Company also has been caused to expend funds in the defense of pending securities and consumer class action lawsuits and the ongoing and concluded investigations referred to herein. A securities class action entitled *Teroganesian v. Southwest Airlines Co. et al*, Docket No. 4:23-cv-00115 (S.D. Tex. Jan 12, 2023) was filed by a plaintiff seeking damages on behalf of a class of purchasers of Southwest common shares between June 13, 2020 and December 31, 2022, inclusive, alleging that SWA and certain of its executives made positive statements containing misrepresentations and omissions concerning SWA's internal controls as well as the readiness and ability of SWA's computer systems, in particular its crew scheduling systems, to function effectively under stressful conditions such as poor weather, while hiding the truth regarding the outdated technology behind these systems.

295.   In addition, at least one consumer class action was filed against SWA, entitled *Capdeville v. Southwest Airlines Co*, Docket No. 2:22-cv-05590 (E.D. La. Dec 30, 2022), alleging damages on behalf of a class consisting of "All persons in the United States who purchased tickets for travel on a Southwest Airlines flight scheduled to operate from December 24, 2022 through the date of a class certification order, whose flight(s) were canceled by Southwest, and who were not provided a refund and reimbursed for incurred expenses as a result of the cancellation". As a direct consequence, SWA has incurred and will continue to incur substantial costs of defending against such litigation and, ultimately, resolving them with SWA's funds, despite the fact that the underlying wrongdoing was and is the responsibility of the Individual Defendants.

### K.    DAMAGE TO LABOR RELATIONS

296.    On January 18, 2023, SWAPA announced its intention to call for a strike authorization vote.  Voting on the matter commenced May 1, 2023.  On May 11, 2023. *Reuters* reported that as of May 11, 98% of SWAPA's 10,000 members participated in the vote with 99% of members voting in favor of authorizing a strike.

### L.    INCREASED REGULATION AND SCRUTINY

297.    On May 8, 2023, the DOT announced plans to launch a new rulemaking that is aimed at requiring airlines to provide compensation and cover expenses for amenities such as meals, hotels, and rebooking when airlines are responsible for stranding passengers.

298.    Buttigieg stated:

When an airline causes a flight cancellation or delay, passengers should not foot the bill.

*   *   *

This rule would, for the first time in U.S. history, propose to require airlines to compensate passengers and cover expenses such as meals, hotels, and rebooking in cases where the airline has caused a cancellation or significant delay.

299.    As a direct result of the wrongdoing referred to herein and the Individual Defendants' concealment thereof in filings with the SEC and otherwise, investors have been defrauded and the Company has been named as a defendant in the SWA Securities Class Action.

300.    SWA has suffered and will continue to suffer substantial harm to an extent not yet fully capable of determination, including the significant deterioration in the market value of the Company.

301.    For years, SWA's senior management and members of the Board became knowledgeable of, but nevertheless concealed, definitive and material information with respect to the extent the operational risk unnecessarily imposed on the Company, conflicts of interest and other wrongful conduct as described herein.  By such concealment, the Individual Defendants have subjected the Company to additional investor litigation and consumer claims.

302.    Because the Company's Board suffers massive conflicts of interest due to the personal culpability of Defendants Kelly and Jordan and other members of the Board, the members of the Board are not capable of advancing solely the Company's interests ahead of their own. Based upon the facts and circumstances described herein, it is clear that the members of the SWA Board cannot deal with Plaintiff's demands for an independent investigation and actions holding wrongdoer responsible objectively, independently, and solely in the Company's best interests.

303.    Should the Company's interests continue to be represented as they are at present, SWA will be irreparably harmed.

304.    Greed surely played some role in the disaster. Most obviously, SWA hadn't spent the money needed to upgrade its scheduling systems which many people inside the airline itself and the airline industry knew was inadequate. Instead, before the pandemic it spent billions on stock buybacks.

## IX.    CAUSES OF ACTION

### COUNT I

**(Against Director Defendants Biegler, Biggins, Brooks, Cunningham, Denison, Gilligan, Hess, Jordan, Kelly, Loeffler, Reynolds, Montford and Ricks for Violations of § 14(a) of the Exchange Act)**

305.    Plaintiff incorporates and realleges each allegation above as if fully set forth herein.

306.    The claims asserted herein arise from the Defendants Biegler, Biggins, Brooks, Cunningham, Denison, Gilligan, Hess, Jordan, Kelly, Loeffler, Reynolds, Montford and Ricks violations of Section 14(a) of the Exchange Act and SEC Rule 14a-9 in connection with the issuance of the Company's 2022 Proxy Statement filed with the SEC on April 8, 2022 in connection with the Annual Meeting of Shareholders on May 18, 2022.

307.    The 2022 Proxy Statement stated that it was solicited on behalf of the Board of Directors which included Defendants Biegler, Biggins, Brooks, Cunningham, Denison, Gilligan, Hess, Jordan, Kelly, Loeffler, Reynolds, Montford and Ricks.

308.    Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a), provides that "[i]t shall be unlawful for any person, by use of the mails or by means of instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

309.    Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. §240.14a-9.

310.    Defendants Biegler, Biggins, Brooks, Cunningham, Denison, Gilligan, Hess, Jordan, Kelly, Loeffler, Reynolds, Montford and Ricks violated §14(a) and Rule 14a-9 because the 2022 Proxy Statement, solicited on their behalf, omitted or misrepresented material facts. Specifically, the 2022 Proxy Statement was materially misleading because it omitted to disclose, *inter alia*, that contrary to descriptions of the Board's risk oversight function regarding risk assessment and risk management, and in particular the responsibility of the Audit Committee to review the Company's technology framework, policies and risk profile, the Board and its committees failed in their governance duties and, as a result,  the Company was exposed and continued to be  exposed to massive operational and financial risk as a result of its' outdated and inadequate technology infrastructure.  Thus, these Defendants caused the Company to issue materially false and misleading statements.

311.    Moreover, the 2022 Proxy Statement was materially false and misleading because it stated that the Company adhered to specific governance policies and procedures when it did not due to Defendants Biegler, Biggins, Brooks, Cunningham, Denison, Gilligan, Hess, Jordan, Kelly, Loeffler, Reynolds, Montford and Ricks' failure to abide by such governance policies and procedures and, thus causing the Company to issue false and misleading statements and/or omissions of material fact.

312.    These defendants knew or should have known that the 2022 Proxy Statement was materially false and misleading in connection with the proposed re-election of each of Defendants Biegler, Biggins, Brooks, Cunningham, Denison, Gilligan, Hess, Jordan, Kelly, Loeffler, Reynolds, Montford and Ricks.

313.    SWA shareholders voting in the annual meetings of shareholders as to election of these Directors were entitled to know the material facts omitted from the Company's 2022 Proxy Statement.

314.    The misrepresentation or omission of material facts from the 2022 Proxy Statement was an essential link in, *inter alia*, the election of each of Defendants Biegler, Biggins, Brooks, Cunningham, Denison, Gilligan, Hess, Jordan, Kelly, Loeffler, Reynolds, Montford and Ricks and the needless exposure of the Company to extraordinary loss by operating with inadequate and outdated scheduling infrastructure.

315.    The false and misleading statements in the 2022 Proxy Statement were material because a reasonable shareholder would have considered them important in deciding how to vote on the various matters set forth in the 2022 Proxy Statement for shareholder action, particularly the election of Company directors.    A reasonable shareholder would consider the omitted information as significantly altering the "total mix" of information made available in the 2022 Proxy Statement.

316.    The Company was damaged and corporate suffrage process corrupted as a result of the material misrepresentations in the 2022 Proxy Statement.

317.    Plaintiff on behalf of SWA has no adequate remedy at law.

## COUNT II

### (Against the Individual Defendants for Breach of Fiduciary Duties)

318.    Plaintiff incorporates and realleges each of the allegations set forth above as if fully set forth herein.

319.     The Individual Defendants all owed and/or owe fiduciary duties to the Company and its shareholders to exercise candor, good faith and loyalty.  By reason of their fiduciary relationships, the Director Defendants specifically owed and owe SWA the highest obligation of good faith and loyalty in the management and administration of the affairs of the Company.

320.     The Individual Defendants further breached their fiduciary duties owed to the Company by failing to act in good faith, in the best interests of SWA and with the care an ordinarily prudent person in similar position.

321.     As reported on December 29, 2022 by the *New York Times*, greed surely played some role in the disaster.  Most obviously, SWA had not spent the money needed to upgrade a scheduling system many people inside the Company knew was inadequate.

322.     SWA's debacle reflected a widespread managerial culture that encourages "cheeseparing" — increasing near term profit by cutting costs until there is no margin for error.

323.     This reckless practice put the Individual Defendants' personal interests for remuneration ahead of the Company's best interests.

324.     Each Individual Defendant had specific fiduciary duties as defined by the Company's key corporate governance documents and principles, and as set forth above, they largely ignored.  Had they been discharged in accordance with the Board's very specific obligations as set forth therein, the misconduct and consequent harm to the Company would not have occurred.

325.     The Individual Defendants, primarily due to their fealty to Defendants Kelly and Jordan whose interests they put before those of the Company, consciously violated their corporate responsibilities and intentionally breached their fiduciary duties to protect the rights and interests of SWA and its shareholders.

326.     The Individual Defendants further breached their fiduciary duties by misrepresenting the Company in the Company's Proxy Statement and other documents filed with the SEC, thereby subjecting the Company to the Securities Class Action, Consumer Class Action and multiple government investigations.

327.     As a direct and proximate result of the Individual Defendants' conscious failure to perform their fiduciary obligations, gross mismanagement and misconduct as alleged herein, they have caused the Company to waste valuable corporate assets, unjustly enrich the Individual Defendants and expend SWA's corporate funds unnecessarily.

### COUNT III

### (Against the Individual Defendants for Indemnification)

328.     Plaintiff incorporates and realleges each allegation contained above as if fully set forth herein.

329.     Plaintiff brings this claim derivatively on behalf of SWA against the Individual Defendants for indemnification under Texas law with respect to damages suffered by the Company arising out of and in connection with the any settlement of the Securities Class Action or Consumer Class Action as described herein.

330.     As a corporate entity that can only act through its representatives, the Company is without fault and is merely vicariously, constructively, derivatively, or technically liable for the wrongful acts of the Individual Defendants.

331.     The Individual Defendants are at fault as a result of engaging in a wrongful course of conduct which resulted in damage to the Company in connection with the Securities Class Action or Consumer Class Action described herein.

332.    The Individual Defendants as officers and directors of SWA owed and owe fiduciary duties to the Company and, therefore, a special relationship exists between SWA and the Individual Defendants.

333.    SWA is entitled to be indemnified by the Individual Defendants for all damages arising out of and in connection with any class action settlements as described herein.

## COUNT IV

### (Against the Individual Defendants for Unjust Enrichment)

334.    Plaintiff incorporates and realleges each of the allegations set forth above as if fully set forth herein.

335.    Each of the Individual Defendants was and is being unjustly compensated by SWA with compensation packages and otherwise despite the failure of their stewardship of the Company and their personal implication in the wrongdoing set forth herein.

336.    The Individual Defendants should be required to account for and repay the Company therefor together with their earnings thereupon.

395.    The Individual Defendants should be enjoined from directly or indirectly receiving and retaining any unjustly paid compensation or any unjust benefits received.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment as follows:

A.    Declaring that SWA's Proxy Statement was materially false and misleading in violation of in violation of Section § 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder;

B.    Declaring that the Individual Defendants breached their fiduciary duties owed to SWA as alleged herein causing substantial damages to SWA;

68

C.      Entering judgment against the Individual Defendants and directing Individual Defendants to pay to the Company the amounts by which SWA has been damaged or will be damaged by reason of the alleged improper conduct;

D.      Awarding SWA restitution from each of the Individual Defendants;

E.      Awarding Plaintiff and its counsel reasonable attorneys' fees, expert fees and other reasonable costs and expenses; and

F.      Granting such other and further relief as this Court may deem just and proper.

## X.    JURY DEMAND

Plaintiff demands a trial by jury on all claims so triable.

Dated: June 13, 2023

**FEDERMAN & SHERWOOD**

*/s/William B. Federman*
William B. Federman (SBN #00794935)
212 W. Spring Valley Rd.
Richardson, TX 75081
Telephone: (405) 235-1560
Email wbf@federmanlaw.com

Howard T. Longman (*pro hac vice* pending)
**LONGMAN LAW, P.C.**
354 Eisenhower Parkway, Ste. 1800
Livingston, NJ 0739
Telephone: (973) 994-2315
Email: hlongman@longman.law

Patrick Slyne (*pro hac vice* pending)
**SLYNE LAW LLC**
800 Westchester Avenue, N641
Rye Brook, NY 10573
Telephone: (914) 279-7000
Email: patrick.slyne@slynelaw.com

*Counsel for Plaintiff*

69

**<u>VERIFICATION</u>**

I, Terri E. Newkirk, on behalf of the Terri E. Newkirk IRA (the "IRA"), have reviewed the allegation made in this Verified Shareholder Derivative Complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true, I further declare that the IRA is a current holder and has been a holder of Southwest Airlines Co. common stock at all relevant times.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed this 13th day of June 2023.

Terri E. Newkirk